# EXHIBIT 1



**null / ALL**
**Transmittal Number: 18982092**
Date Processed: 11/19/2018

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Stevi McIntosh<br>Volkswagen Group of America, Inc.<br>2200 Ferdinand Porsche Drive<br>Herndon, VA 20171-5884 |

| | |
|---|---|
| **Entity:** | Volkswagen Group of America, Inc.<br>Entity ID Number  0456194 |
| **Entity Served:** | Volkswagen Group of America Inc fka Volkswagen of America Inc |
| **Title of Action:** | Hassan Aljuaid vs. Volkswagen Group of America, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Fairfax County Circuit Court, VA |
| **Case/Reference No:** | CL-2018-0015768 |
| **Jurisdiction Served:** | Virginia |
| **Date Served on CSC:** | 11/16/2018 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Charles Wade Miller<br>214-237-9001 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

Hassan Aljuaid et al. vs. Volkswagen Group of America Inc et al.

CL-2018-0015768

TO:    Volkswagen Group of America Inc
       fka Volkswagen of America Inc
       Serve: Registered Agent Corporation, Service Company
       Bank of America Center
       1111 East Main Street
       Richmond, VA 23219

**SUMMONS – CIVIL ACTION**

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 8, 2018.

JOHN T. FREY, CLERK

By: _Christine M. Dillon_
                **Deputy Clerk**

Plaintiff's Attorney:  Charles W Miller

SPS

RECEIVED
NOV 1 6 2018
BY: A.S./Q.G.C.
On-site

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**Hassan Aljuaid et al. vs. Volkswagen Group of America Inc et al.**

**CL-2018-0015768**

TO:     **Audi of America LLC**
        **2200 Ferdinand Porsche Drive**
        **Herndon, VA 20171**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on November 8, 2018.

                    JOHN T. FREY, CLERK
              By: _Christine M. Dillon_
                    **Deputy Clerk**

**Plaintiff's Attorney:  Charles W Miller**

**VIRGINIA:**

FILED
CIVIL INTAKE
2018 NOV -5 AM 11: 39
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

| | | |
|---|---|---|
| HASSAN ALJUAID, KAREN GLADSTONE, RICK ROCK, KRISTEN POWELL ROCK, MARK SIMPSON, RICKEY STUDDARD, STUDDARD CONSTRUCTION, STEVE CALDERONI, KENVIR DIXON, KELLI KIRKLAND, DERRICK DOBBIN, MICHAEL ENGLAND, MICHELLE ENGLAND, JASON HANSEN, JAMES LADD, LELA LADD, EDWARD MARCHAND, BRIGITTE MARCHANG, GREG MARTINEZ, STEVEN MARTINEZ, JAY MCCUTCHAN, FRANK MCROBBIE, MICHAEL OROURKE, THOR WISHART, KAREN WISHART, ROGER BATTACHARIA, LEE COUTURE, TOM GOOSMANN, KAREN CHRISTIAN, GERALD COLE, SCOTT BERGER, HARRIET BERGER, MICHAEL BORGAILO, RICHARD BRILHANTE, JIMMY CLARK, RACHEL CODY, GRAHAM FRANKLIN, MICHAEL FRANKLIN, MATT GANOVSKY, KAREN GANOVSKY, ADAM JACKSON, ARTHUR JACOBY, MELISSA KUKK, ANDREW LADORES, DEAN NEWHARD, RAMON OZAMBELA, PAUL RATHERT, DANIELLE RATHERT, AURELIO REYES, ERIC SCHILLING, JOEL UPTMOR, SCOTT WEINBERG, WILLIAM WILLOUGHBY, MARGARET WILLOUGHBY, LYNDON WILSON, MARGARET DEAN, KYLE GRAHAM, TODD CREEK, DONALD CLAY, JACK DUFFARD, MARK HODGE, ROBERT MILLER, SEAN MUNIZ, DAVID SLOANE, KEIRA BOBO, SHELIA POWELL, BLANE MIRE, KENNETH CALDWELL, JACQUELINE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: **2018   15768** |

1

DAVIS, EDWARD HANSON, PAMELA )
HERTZ, CATHERINE HYDE, ALAN )
MINTZ, JUDIE MINTZ, SCOTT )
NIELSON, ANDREW OH, DERRICK )
PENNEY, SHELDON RAYMAN, )
THOMAS TAIT, KATHERINE TAIT, )
STEPHANIE BASILE, RYAN GISETTO, )
MONICA GISETTO, MICHAEL ASSILE, )
ASHRAFUL AZIZ, JEFF BASILE, )
NATHALIE BASILE, STEVE BORNE, )
HOWARD BREGMAN, ANDRE )
BROOKS, STUART CASSEL, PETER )
CHANG, RAJNI CHOKSI, SUZANNE )
DILL, PAUL DINICE, THEODORE )
FREDERICKS, FRANK GALZARANO, )
JONATHAN KATZ, PETER )
KOWALCHUK, KEITH LERNER, )
MIKAEL LEVEY, JESSICA LEVEY, )
DOUGLAS MARQUEZ, PETER )
MARTORANO, ROBERT NORTHFIELD, )
LINDA NOVELLI, FAHRUDIN (FRANK) )
OMEROVIC, DAWN PAGANO, ROSS )
PAGANO, THOMAS PETRELLI, )
KATHLEEN PETRELLI, RENIER )
PIERANTONI, LISA CAMPISI, AFTAB )
PUNJWANI, ROBERT RITTER, )
MATHEW RULNICK, TONY SHABO, )
ILAN SHEMTOV, CHRISTOPHER SHIN, )
DUKE SHIN, STEPHANIE SMITH, )
BARRY STANGEL, MICHAEL TESTA, )
GUIDO URZUA, JESSICA URZUA, )
KEVIN VO, WILLIAM WALLNER, )
THOMAS WHITE, RONALD WILSON, )
RAYMOND WOODS JOSE )
ZIMMERMAN, BRENT ARMSTRONG, )
RACHEL ARMSTRONG, TODD )
GRAVES, MORRIS EDELSTEIN, )
RAYNARD GAGNON, JEFFREY )
GARTNER, THADDEUS KUZNIAREK, )
JULIE MULLIGAN, JOHN PECORARO, )
PAUL SABY, EDGAR ROMANO, TORRE )
ALBRITTON, CYNTHIA ALBRITTON, )
SUSAN CARR ARNEY, MICHAEL )

2

CIANCIARULO, DOUG CODY, DORIS )
GREEN CODY, MICHAEL DEARMENT, )
AJAY GUPTA, NICKY JACKSON, JAY )
JOHNSON, JOHN KASPAR, TIMOTHY )
KING, RICHARD KOCH, DOUGLAS )
LEONARD, KAL PATEL, LATRELL )
PERSON, AVERY WINDER, CODY )
DICKINSON, BERTHA DONOVAN, )
TODD GRAVES, KEVIN LITTLE, )
ANTHONY LOVE, DONNIE NABORS, )
MICHAEL ANNESS, LINDSAY ANNESS, )
FRANCOISE BARRIONUEVO, GERMAN )
BARRIONUEVO, ALAN BAXTER, )
ANTHONY BROOKS, TONI INGRAM, )
DAVID KALER, JOHN KEARINS, )
ANDREW LIEBERMAN, FRANCIS )
MEDURI, MARIO MESSINA, JOHN )
NIGRO, PAUL O'BRIEN, ALAN )
PAPINSICK, KIMBERLEY )
ROSENSTEIN, LUCAS STACHURSKI, )
TIEN TANG, JEFFREY TILLERY, )
SCOTT WETHERBY,  JEREMY BROWN, )
ALEXANDRA BROWN,  JAMES DOWD, )
JASON KELLY, MAHESH PATEL, )
DAVID YIM, MARC BENNETT, JOY )
BENNETT, JUSTIN GRAHAM, PAUL )
KUKICH, JUDITH MATTHEWS, EDDIE )
ROBBA, URI BERENSHTEIN, ANNA )
BERENSHTEIN, BEN CURRIN, )
KENNETH GOLDBERG, ANDREW )
HASENYAGER, RICHARD LAWLOR, )
JAMES NEEDHAM, PAUL NORDHOLM, )
RICHARD BUTERBAUGH, SUSAN )
HAMBRIC, JACKIE KIRBY, )
GERALDINE KIRBY, WALLER )
MATHIAS, TINA MILLS AND KENT )
MILLS )
)
      Plaintiffs, )
)
v. )
)
VOLKSWAGEN GROUP OF AMERICA, )
INC.

3

f/k/a VOLKSWAGEN OF AMERICA,          )
INC.                                  )
Serve:  Corporation Service Company   )
        Bank of America Center        )
        1111 East Main St.            )
        Richmond, VA 23219            )
                                      )
VOLKSWAGEN                            )
AKTIENGESELLSCHAFT                    )
Serve:  Brieffach 1998, D-38436       )
        Wolfsburg, Germany            )
                                      )
AUDI AKTIENGESELLSCHAFT               )
Serve:  Postfach 10 04 57             )
        85045 Ingolstadt, Germany.    )
                                      )
AUDI OF AMERICA, LLC                  )
Serve:  2200 Ferdinand Porsche Drive  )
        Herndon, Virginia 20171.      )
                                      )
        Defendants.                   )
                                      )
                                      )
                                      )
                                      )

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs listed and set forth herein below file this Original Complaint and Jury Trial Demand complaining of Defendants Volkswagen Group of America, Inc., Volkswagen Aktiengesellschaft, Audi Aktiengesellschaft, and Audi of America, LLC and for cause of action would show as follows:

### PARTIES

### PLAINTIFFS

### The Arizona Plaintiffs

1.      Plaintiff Hassan Aljuaid is a citizen of the State of Arizona who acquired a 2014 Audi Q5 in the State of Arizona.

4

2.     Plaintiff Karen Gladstone is a citizen of the State of Arizona who acquired a 2016 Audi A6 in the State of Arizona.

3.     Plaintiffs Rick Rock and Kristen Powell Rock are citizens of the State of Arizona who acquired a 2012 Audi A8 in the State of Arizona.

### The Arkansas Plaintiffs

4.     Plaintiffs Jackie Kirby and Geraldine Kirby are citizens of the State of Arkansas who acquired a 2012 A6 in the State of Arkansas.

5.     Plaintiff Mark Simpson is a citizen of the State of Arkansas who acquired a 2015 Q5 in the State of Arkansas.

6.     Plaintiffs Rickey Studdard and Studdard Construction Co, Inc. are citizens of the State of Arkansas who acquired a 2016 Audi A6 in the State of Arkansas.

### The Colorado Plaintiffs

7.     Plaintiff Steve Calderoni is a citizen of the State of Colorado who acquired a 2016 Audi Q5 in the State of Colorado.

8.     Plaintiff Kenvir Dixon and Kelli Kirkland are citizens of the State of Colorado who acquired a 2016 Audi A7 in the State of Colorado.

9.     Plaintiff Derrick Dobbin is a citizen of the State of Colorado who acquired a 2016 Audi SQ5 in the State of Colorado.

10.    Plaintiffs Michael England and Michelle England are citizens of the State of Virginia who acquired a 2014 Audi Q5 in the State of Colorado.

11.    Plaintiff Jason Hansen is a citizen of the State of Colorado who acquired a 2013 Audi A7 in the State of Colorado.

12.    Plaintiffs James Ladd and Lela Ladd are citizens of the State of Wyoming who acquired a 2016 Audi A6 in the State of Colorado.

13.    Plaintiffs Edward Marchand and Brigitte Marchand are citizens of the State of Colorado who acquired a 2016 Audi A8 in the State of Colorado.

14.    Plaintiffs Greg Martinez and Steven Martinez are citizens of the State of Minnesota who acquired a 2015 Audi A8 in the State of Colorado.

15.    Plaintiff Jay McCutchan is a citizen of the State of Colorado who acquired a 2014 Audi A6 in the State of Colorado.

16.    Plaintiff Frank McRobbie is a citizen of the State of Colorado who acquired a 2013 Audi A6 in the State of Colorado.

17.    Plaintiff Michael Orourke is a citizen of the State of Colorado who acquired a 2016 Audi A6 in the State of Colorado.

18.    Plaintiffs Thor Wishart and Karen Wishart are citizens of the State of Florida who acquired a 2015 Audi A8 in the State of Colorado.

**The Connecticut Plaintiffs**

19.    Plaintiff Roger Battacharia is a citizen of the State of New York who acquired a 2015 Audi Q5 in the State of Connecticut.

20.    Plaintiff Lee Couture is a citizen of the State of Connecticut who acquired a 2012 Audi A6 in the State Connecticut.

21.    Plaintiff Tom Goosmann is a citizen of the State of Connecticut who acquired a 2016 Audi A6 in the State of Connecticut.

6

**The Washington DC Plaintiff**

22.    Plaintiff Karen Christian is a citizen of the State of Washington DC who acquired a 2013 Audi A7 in the State of Washington DC.

**The Delaware Plaintiff**

23.    Plaintiff Gerald Cole is a citizen of the State of Delaware who acquired a 2014 Audi A6 in the State of Delaware.

**The Florida Plaintiffs**

24.    Plaintiff Scott Berger and Harriet Berger are citizens of the State of Florida who acquired a 2014 Audi A8 in the State of Florida.

25.    Plaintiff Michael Borgailo is a citizen of the State of Florida who acquired a 2015 Audi A8 in the State of Florida.

26.    Plaintiff Richard Brilhante is a citizen of the State of Florida who acquired a 2013 Audi A6 in the State of Florida.

27.    Plaintiff Jimmy Clark is a citizen of the State of Florida who acquired a 2013 Audi A7 in the State of Florida.

28.    Plaintiff Rachel Cody is a citizen of the State of Georgia who acquired a 2015 Audi A8 in the State of Florida.

29.    Plaintiffs Graham Franklin and Michael Franklin are citizens of the State of Florida who acquired a 2013 Audi A6 in the State of Florida.

30.    Plaintiffs Matt Ganovsky and Karen Ganovsky are citizens of the State of Florida who acquired a 2013 Audi A8 in the State of Florida.

31.    Plaintiff Adam Jackson is a citizen of the State of Maine who acquired a 2013 Audi A6 in the State of Florida.

32.     Plaintiff Arthur Jacoby is a citizen of the State of Florida who acquired a 2015 Audi A8 in the State of Florida.

33.     Plaintiff Melissa Kukk is a citizen of the State of Florida who acquired a 2014 Audi A6 in the State of Florida.

34.     Plaintiff Andrew Ladores is a citizen of the State of Alabama who acquired a 2013 Audi A8 in the State of Florida.

35.     Plaintiff Dean Newhard is a citizen of the State of Pennsylvania who acquired a 2013 Audi A6 in the State of Florida.

36.     Plaintiff Ramon Ozambela is a citizen of the State of Florida who acquired a 2015 Audi A6 in the State of Florida.

37.     Plaintiff Paul Rathert and Danielle Rathert are citizens of the State of California who acquired a 2015 Audi A8 in the State of Florida.

38.     Plaintiff Aurelio Reyes is a citizen of the State of Florida who acquired a 2016 Audi A6 in the State of Florida.

39.     Plaintiff Eric Schilling is a citizen of the State of Florida who acquired a 2013 Audi A6 in the State of Florida.

40.     Plaintiff Joel Uptmor is a citizen of the State of Florida who acquired a 2013 Audi A6 in the State of Florida.

41.     Plaintiff Scott Weinberg is a citizen of the State of Florida who acquired a 2013 Audi A8 in the State of Florida.

42.     Plaintiffs William Willoughby and Margaret Willoughby are citizens of the State of Florida who acquired 2015 Audi Q5 in the State of Florida.

43.    Plaintiff Lyndon Wilson is a citizen of the State of Florida who acquired a 2014 Audi SQ5 and a 2014 Audi Q5 in the State of Florida.

44.    Plaintiff Margaret Dean is a citizen of the State of Florida who acquired a 2013 Audi A7 in the State of Florida.

### The Kansas Plaintiff

45.    Plaintiff Kyle Graham is a citizen of the State of Kansas who acquired a 2013 Audi Q5 in the State of Kansas.

### The Kentucky Plaintiff

46.    Plaintiff Todd Creek is a citizen of the State of Kentucky who acquired a 2013 Audi A7 in the State of Kentucky.

### The Louisiana Plaintiffs

47.    Plaintiff Donald Clay is a citizen of the State of Louisiana who acquired a 2012 Audi A8 in the State of Louisiana.

48.    Plaintiff Jack Duffard is a citizen of the State of Louisiana who acquired a 2013 Audi A6 in the State of Louisiana.

49.    Plaintiff Mark Hodge is a citizen of the State of Mississippi who acquired a 2013 Audi A6 in the State of Louisiana.

50.    Plaintiff Robert Miller is a citizen of the State of Louisiana who acquired a 2013 Audi A8 in the State of Louisiana.

### The Minnesota Plaintiffs

51.    Plaintiff Sean Muniz is a citizen of the State of Minnesota who acquired a 2013 Audi Q5 in the State of Minnesota.

52.    Plaintiff David Sloane is a citizen of the State of Minnesota who acquired a 2015 Audi A8 in the State of Minnesota.

### The Mississippi Plaintiffs

53.    Plaintiff Keira Bobo and Shelia Powell are citizens of the State of Mississippi who acquired a 2012 Audi A7 in the State of Mississippi.

54.    Plaintiff Blane Mire is a citizen of the State of Mississippi who acquired a 2014 Audi A8 in the State of Mississippi.

### The Nevada Plaintiffs

55.    Plaintiff Kenneth Caldwell is a citizen of the State South Carolina who acquired a 2013 Audi Q5 in the State of Nevada.

56.    Plaintiff Jacqueline Davis is a citizen of the State of Michigan who acquired a 2014 Audi SQ5 in the State of Nevada.

57.    Plaintiff Edward Hanson is a citizen of the State of Arizona who acquired a 2016 Audi A6 in the State of Nevada.

58.    Plaintiff Pamela Hertz is a citizen of the State of Nevada who acquired a 2013 Audi A8 in the State of Nevada.

59.    Plaintiff Catherine Hyde is a citizen of the State of Nevada who acquired a 2012 Audi A7, 2013 Audi A8, and a 2016 Audi A8 in the State of Nevada.

60.    Plaintiffs Alan Mintz and Judie Mintz are citizens of the State of California who acquired a 2015 Audi A8 in the State of Nevada.

61.    Plaintiff Scott Nielson is a citizen of the State of Utah who acquired a 2014 Audi A8 in the State of Nevada.

62.    Plaintiff Andrew Oh is a citizen of the State of Oregon who acquired a 2012 Audi A6 in the State of Nevada.

63.    Plaintiff Derrick Penney is a citizen of the State of Nevada who acquired a 2012 Audi A6 in the State of Nevada.

64.    Plaintiff Sheldon Rayman is a citizen of the State of Nevada who acquired a 2016 Audi A7 in the State of Nevada.

65.    Plaintiffs Thomas and Katherine Tait are citizens of the State of Nevada who acquired a 2013 Audi A6 in the State of Nevada.

### The New Hampshire Plaintiffs

66.    Plaintiff Stephanie Basile is a citizen of the State of South Carolina who acquired a 2016 Audi Q5 in the State of New Hampshire.

67.    Plaintiffs Ryan and Monica Gisetto are citizens of the State of New Hampshire who acquired a 2016 Audi A6 in the State of New Hampshire.

### The New Jersey Plaintiffs

68.    Plaintiff Michael Assile is a citizen of the State of New Jersey who acquired a 2014 Audi A8 in the State of New Jersey.

69.    Plaintiff Ashraful Aziz is a citizen of the State of Georgia who acquired a 2012 Audi A6 in the State of New Jersey.

70.    Plaintiffs Jeff Basile and Nathalie Basile are citizens of the State of New Jersey who acquired a 2013 Audi Q5 in the State of New Jersey.

71.    Plaintiff Steve Borne is a citizen of the State of New York who acquired a 2013 Audi Q5 in the State of New Jersey.

11

72.    Plaintiff Howard Bregman is a citizen of the State of Florida who acquired a 2014 Audi A8L in the State of New Jersey.

73.    Plaintiff Andre Brooks is a citizen of the State of North Carolina who acquired a 2012 Audi A6 in the State of New Jersey.

74.    Plaintiffs Renier Pierantoni and Lisa Campisi are citizens of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

75.    Plaintiff Stuart Cassel is a citizen of the State of New Jersey who acquired a 2015 Audi A6 in the State of New Jersey.

76.    Plaintiff Peter Chang is a citizen of the State of New York who acquired a 2016 Audi S6 in the State of New Jersey.

77.    Plaintiff Rajni Choksi is a citizen of the State of New York who acquired a 2012 Audi A6 in the State of New Jersey.

78.    Plaintiff Suzanne Dill is a citizen of the State of New York who acquired a 2016 Audi Q5 in the State of New Jersey.

79.    Plaintiff Paul Dinice is a citizen of the State of New Jersey who acquired a 2016 Audi Q5 in the State of New Jersey.

80.    Plaintiff Theodore Fredericks is a citizen of the State of New Jersey who acquired a 2012 Audi AG in the State of New Jersey.

81.    Plaintiff Frank Galzarano is a citizen of the State of New Jersey who acquired a 2014 Audi A8 in the State of New Jersey.

82.    Plaintiff Jonathan Katz is a citizen of the State of New York who acquired a 2015 Audi A7 in the State of New Jersey.

83.    Plaintiff Peter Kowalchuk is a citizen of the State of New Jersey who acquired a 2013 Audi A6 in the State of New Jersey.

84.    Plaintiff Keith Lerner is a citizen of the State of New Jersey who acquired a 2015 Audi A6 in the State of New Jersey.

85.    Plaintiffs Mikael Levey and Jessica Levey are citizens of the State of Connecticut who acquired a 2013 Audi A7 in the State of New Jersey.

86.    Plaintiff Douglas Marquez is a citizen of the State of New Jersey who acquired a 2013 Audi A8 in the State of New Jersey.

87.    Plaintiff Peter Martorano is a citizen of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

88.    Plaintiff Robert Northfield is a citizen of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

89.    Plaintiff Linda Novelli is a citizen of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

90.    Plaintiff Fahrudin (Frank) Omerovic is a citizen of the State of New York who acquired a 2013 Audi A6 in the State of New Jersey.

91.    Plaintiffs Dawn Pagano and Ross Pagano are citizens of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

92.    Plaintiff Thomas Petrelli and Kathleen Petrelli are citizens of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

93.    Plaintiff Aftab Punjwani is a citizen of the State of Texas who acquired a 2014 Audi A8L in the State of New Jersey.

94.     Plaintiff Robert Ritter is a citizen of the State of New Jersey who acquired a 2014 Audi A6 in the State of New Jersey.

95.     Plaintiff Mathew Rulnick is a citizen of the State of North Carolina who acquired a 2015 Audi A8 in the State of New Jersey.

96.     Plaintiff Tony Shabo is a citizen of the State of New Jersey who acquired a 2014 Audi Q5 in the State of New Jersey.

97.     Plaintiff Ilan Shemtov is a citizen of the State of New Jersey who acquired a 2014 Audi A7 in the State of New Jersey.

98.     Plaintiffs Christopher Shin and Duke Shin are citizens of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

99.     Plaintiff Stephanie Smith is a citizen of the State of New Jersey who acquired a 2014 Audi A6 in the State of New Jersey.

100.     Plaintiff Barry Stangel is a citizen of the State of New York who acquired a 2016 Audi A8 in the State of New Jersey.

101.     Plaintiff Michael Testa is a citizen of the State of New York who acquired a 2012 Audi A6 in the State of New Jersey.

102.     Plaintiffs Guido Urzua and Jessica Urzua are citizens of the State of New Jersey who acquired a 2015 Audi SQ5 in the State of New Jersey.

103.     Plaintiff Kevin Vo is a citizen of the State of New Jersey who acquired a 2013 Audi Q5 and a 2013 Audi A6 in the State of New Jersey.

104.     Plaintiff William Wallner is a citizen of the State of New Jersey who acquired a 2013 Audi A6 in the State of New Jersey.

105.    Plaintiff Thomas White is a citizen of the State of New Jersey who acquired a 2012 Audi A6 in the State of New Jersey.

106.    Plaintiff Ronald Wilson is a citizen of the State of New York who acquired a 2013 Audi A6 in the State of New Jersey.

107.    Plaintiff Raymond Woods is a citizen of the State of New York who acquired a 2016 Audi Q5 in the State of New Jersey.

108.    Plaintiff Jose Zimmerman is a citizen of the State of New York who acquired a 2012 Audi A8 in the State of New Jersey.

## The New Mexico Plaintiffs

109.    Plaintiffs Brent and Rachel Armstrong are citizens of the State of New Mexico who acquired a 2016 Audi Q5 in the State of New Mexico.

110.    Plaintiff Todd Graves is a citizen of the State of Oklahoma who acquired a 2012 Audi A7 in the State of New Mexico.

## The New York Plaintiffs

111.    Plaintiff Morris Edelstein is a citizen of the State of New York who acquired a 2016 Audi A8 in the State of New York.

112.    Plaintiff Raynard Gagnon is a citizen of the State of New York who acquired a 2012 Audi Q5 in the State of New York.

113.    Plaintiff Jeffrey Gartner is a citizen of the State of New York who acquired a 2014 Audi A6 in the State of New York.

114.    Plaintiff Thaddeus Kuzniarek is a citizen of the State of New York who acquired a 2012 Audi A6 in the State of New York.

115.    Plaintiff Julie Mulligan is a citizen of the State of New York who acquired a 2013 Audi A6 in the State of New York.

116.    Plaintiff John Pecoraro is a citizen of the State of New York who acquired a 2012 Audi A6 in the State of New York.

117.    Plaintiff Paul Saby is a citizen of the State of Georgia who acquired a 2013 Audi Q5 in the State of New York.

118.    Plaintiff Edgar Romano is a citizen of the State of New York who acquired a 2015 Audi A8 in the State of New York.

### The North Carolina Plaintiffs

119.    Plaintiffs Torre Albritton and Cynthia Albritton are citizens of the State of North Carolina who acquired a 2014 Audi Q5 in the State of North Carolina.

120.    Plaintiff Susan Carr Arney is a citizen of the State of North Carolina who acquired a 2014 Audi Q5 in the State of North Carolina.

121.    Plaintiff Michael Cianciarulo are citizens of the State of North Carolina who acquired a 2013 Audi A7 in the State of North Carolina.

122.    Plaintiff Doug Cody and Doris Green Cody are citizens of the State of North Carolina who acquired a 2015 Audi Q5 in the State of North Carolina.

123.    Plaintiff Michael DeArment is a citizen of the State of North Carolina who acquired a 2012 Audi A6 in the State of North Carolina.

124.    Plaintiff Ajay Gupta is a citizen of the State of North Carolina who acquired a 2015 Audi A8 in the State of North Carolina.

125.    Plaintiff Nicky Jackson is a citizen of the State of North Carolina who acquired a 2012 Audi A7 in the State of North Carolina.

126.    Plaintiff Jay Johnson is a citizen of the State of South Carolina who acquired a 2012 Audi A8 in the State of North Carolina.

127.    Plaintiff John Kaspar is a citizen of the State of North Carolina who acquired a 2012 Audi A6 in the State of North Carolina.

128.    Plaintiff Timothy King is a citizen of the State of North Carolina who acquired a 2015 Audi A8 in the State of North Carolina.

129.    Plaintiff Richard Koch is citizen of the State of North Carolina who acquired a 2012 Audi A6 in the State of North Carolina.

130.    Plaintiff Douglas Leonard is a citizen of the State of Indiana who acquired a 2013 Audi A6 in the State of North Carolina.

131.    Plaintiff Kal Patel is a citizen of the State of North Carolina who acquired a 2012 Audi A6 in the State of North Carolina.

132.    Plaintiff Latrell Person is a citizen of the State of South Carolina who acquired a 2012 Audi A8 in the State of North Carolina.

133.    Plaintiff Avery Winder is a citizen of the State of North Carolina who acquired a 2012 Audi A7 in the State of North Carolina.

### The Oklahoma Plaintiffs

134.    Plaintiff Cody Dickinson is a citizen of the State of Oklahoma who acquired a 2013 Audi Q5 in the State of Oklahoma.

135.    Plaintiff Bertha Donovan is a citizen of the State of Oklahoma who acquired a 2013 Audi A7 in the State of Oklahoma.

136.    Plaintiff Todd Graves is a citizen of the State of Oklahoma who acquired a 2015 Audi A8 in the State of Oklahoma.

17

137.    Plaintiff Kevin Little is a citizen of the State of Texas who acquired a 2012 Audi A7 in the State of Oklahoma.

138.    Plaintiff Anthony Love is a citizen of the State of Missouri who acquired a 2012 Audi A7 in the State of Oklahoma.

139.    Plaintiff Donnie Nabors is a citizen of the State of Oklahoma who acquired a 2015 Audi A8L in the State of Oklahoma.

### The Pennsylvania Plaintiffs

140.    Plaintiffs Michael Anness and Lindsay Anness are citizens of the State of Pennsylvania who acquired a 2013 Audi Q5 in the State of Pennsylvania.

141.    Plaintiffs Francoise Barrionuevo and German Barrionuevo are citizens of the State of Pennsylvania who acquired a 2013 Audi Q5 in the State of Pennsylvania.

142.    Plaintiff Alan Baxter is a citizen of the State of Illinois who acquired a 2016 Audi A6 in the State of Pennsylvania.

143.    Plaintiff Anthony Brooks is a citizen of the State of Pennsylvania who acquired a 2016 Audi A6 in the State of Pennsylvania.

144.    Plaintiff Toni Ingram is a citizen of the State of Pennsylvania who acquired a 2013 Audi Q5 in the State of Pennsylvania.

145.    Plaintiff David Kaler is a citizen of the State of New Jersey who acquired a 2015 Audi A8 in the State of Pennsylvania.

146.    Plaintiff John Kearins is a citizen of the State of Pennsylvania who acquired a 2016 Audi Q5 in the State of Pennsylvania.

147.    Plaintiff Andrew Lieberman is a citizen of the State of New Jersey who acquired a 2014 Audi A7 in the State of Pennsylvania.

18

148.    Plaintiff Francis Meduri is a citizen of the State of Ohio who acquired a 2015 Audi A6 in the State of Pennsylvania.

149.    Plaintiff Mario Messina is a citizen of the State of Pennsylvania who acquired a 2014 Audi A7 in the State of Pennsylvania.

150.    Plaintiff John Nigro is a citizen of the State of Pennsylvania who acquired a 2016 Audi Q5 in the State of Pennsylvania.

151.    Plaintiff Paul O'Brien is a citizen of the State of Pennsylvania who acquired a 2016 Audi A7 and a 2015 Audi Q5 in the State of Pennsylvania.

152.    Plaintiff Alan Papinsick is a citizen of the State of Pennsylvania who acquired a 2015 Audi Q5 in the State of Pennsylvania.

153.    Plaintiff Kimberley Rosenstein is a citizen of the State of Pennsylvania who acquired a 2012 Audi A6 in the State of Pennsylvania.

154.    Plaintiff Lucas Stachurski is a citizen of the State of Pennsylvania who acquired a 2015 Audi A6 in the State of Pennsylvania.

155.    Plaintiff Tien Tang is a citizen of the State of Virginia who acquired a 2013 Audi Q5 in the State of Pennsylvania.

156.    Plaintiff Jeffrey Tillery is a citizen of the State of Pennsylvania who acquired a 2012 Audi A8 in the State of Pennsylvania.

157.    Plaintiff Scott Wetherby is a citizen of the State of Pennsylvania who acquired a 2014 Audi A6 in the State of Pennsylvania.

### The South Carolina Plaintiffs

158.    Plaintiffs Jeremy Brown and Alexandra Brown are citizens of the State of South Carolina who acquired a 2014 Audi SQ5 in the State of South Carolina.

19

159.    Plaintiff James Dowd is a citizen of the State of South Carolina who acquired a 2013 Audi A8 in the State of South Carolina.

160.    Plaintiff Jason Kelly is a citizen of the State of South Carolina who acquired a 2012 Audi A6 in the State of South Carolina.

161.    Plaintiff Waller Mathias is a citizen of the State of South Carolina who acquired a 2012 Audi A8 in the State of South Carolina.

162.    Plaintiff Mahesh Patel is a citizen of the State of South Carolina who acquired a 2015 Audi A8 in the State of South Carolina.

163.    Plaintiff David Yim is a citizen of the State of South Carolina who acquired a 2016 Audi Q5 in the State of South Carolina.

## The Tennessee Plaintiffs

164.    Plaintiffs Marc Bennett and Joy Bennett are citizens of the State of Tennessee who acquired a 2014 Audi A8 in the State of Tennessee.

165.    Plaintiff Justin Graham is a citizen of the State of California who acquired a 2015 Audi A6 in the State of Tennessee.

166.    Plaintiffs Paul Kukich and Judith Matthews are citizens of the State of Tennessee who acquired a 2016 Audi Q5 in the State of Tennessee.

167.    Plaintiff Eddie Robba is a citizen of the State of Tennessee who acquired a 2016 Audi Q5 in the State of Tennessee.

## The Washington Plaintiffs

168.    Plaintiffs Uri Berenshtein and Anna Berenshtein are citizens of the State of Washington who acquired a 2016 Audi Q5 in the State of Washington.

169.    Plaintiffs Ben Currin is a citizen of the State of Oregon who acquired a 2015 Audi Q5 in the State of Washington.

170.    Plaintiff Kenneth Goldberg is a citizen of the State of Washington who acquired a 2012 Audi A8 in the State of Washington.

171.    Plaintiff Andrew Hasenyager is a citizen of the State of Washington who acquired a 2012 Audi A6 in the State of Washington.

172.    Plaintiff Richard Lawlor is a citizen of the State of Washington who acquired a 2014 Audi A7 in the State of Washington.

173.    Plaintiffs Tina Mills and Kent Mills are citizens of the State of Idaho who acquired a 2016 Audi Q5 in the State of Washington.

174.    Plaintiff James Needham is a citizen of the State of Washington who acquired a 2013 Audi A7 in the State of Washington.

175.    Plaintiff Paul Nordholm is a citizen of the State of Washington who acquired a 2012 Audi A7 in the State of Washington.

### The West Virginia Plaintiffs

176.    Plaintiff Richard Buterbaugh is a citizen of the State of West Virginia who acquired a 2012 Audi A7 in the State of West Virginia.

177.    Plaintiff Susan Hambric is a citizen of the State of Washington who acquired a 2012 Audi A6 in the State of West Virginia.

### DEFENDANTS

178.    Volkswagen Aktiengesellschaft ("VW AG") is a German corporation with its principal place of business at Berliner Ring 2, 38440 Wolfsburg, Germany.  VW AG may be served with process through its wholly owned U.S. subsidiary, Volkswagen Group of America, Inc., 2200

Ferdinand Porsche Dr., Herndon, VA 20171. VW AG may be served with process either by serving any officer or director of Volkswagen Group of America, Inc., at 2200 Ferdinand Porsche Dr., Herndon, VA 20171 or by serving Volkswagen Group of America, Inc. through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

179.    Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. VW America may be served with process by serving its registered agent, Corporation Service Company, Bank of America Center, 1111 East Main St., Richmond, VA 23219. VW America is a wholly-owned subsidiary of VW AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.

180.    Audi Aktiengesellschaft ("Audi AG") is a German corporation with its principal place of business at Auto-Union-Straße 1, 85045 Ingolstadt, Germany. Audi AG may be served with process either by serving any officer or director of Volkswagen Group of America, Inc., at 2200 Ferdinand Porsche Dr., Herndon, VA 20171 or by serving Volkswagen Group of America, Inc. through its registered agent for service of process, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

181.    Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. Audi America may be served with process at 2200 Ferdinand Porsche Dr., Herndon, VA 20171. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

## AGENCY

182.    At all relevant times to the allegations in this lawsuit, VW America, Audi AG, and Audi America were the agents of VW AG and all misrepresentations at issue in this lawsuit and described below in more detail were made with knowledge and intent by VW AG, VW America, Audi AG, and Audi America that the misrepresentations would be repeated to third-parties, like Plaintiffs, and that such third-parties would rely on them.

183.    For purposes of this Complaint, VW AG, VW America, Audi AG, and Audi America shall collectively be referred to as "Defendants," the "Audi Gasoline Defendants," or "Audi."

## JURISDICTION AND VENUE

### Personal Jurisdiction over VW America and Audi America

184.    Personal jurisdiction over VW America and Audi America is proper in Virginia because both entities are corporate citizens of Virginia, having registered to do business with the Virginia State Corporation Commission, and because they maintain their principal places of business in Fairfax County, Virginia.

### Personal Jurisdiction over Volkswagen AG

185.    Personal jurisdiction over Volkswagen AG is proper because Volkswagen AG acted both directly and indirectly to (1) transact business in Virginia; (2) supply services or things in Virginia; (3) cause tortious injury by an act or omission in Virginia; and (4) cause tortious injury in Virginia by an act or omission outside Virginia and regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in Virginia. *See* Va. Code Ann. 8.01-328.1.

186.    Personal jurisdiction over Volkswagen AG is proper because of Volkswagen AG's own direct contacts with the state of Virginia concerning the fraud that forms the basis of this lawsuit. Personal jurisdiction over Volkswagen AG is further proper because the Virginia contacts of Volkswagen America, Audi America, and Audi AG concerning the fraud that forms the basis of this lawsuit can be imputed to Volkswagen AG pursuant to the agency relationship between and among the parties, alter ego, conspiracy theory, and joint venture.

187.    As set forth below, Volkswagen America, Audi AG, and Audi America are the agents, both actual and implied, of Volkswagen AG and were Volkswagen AG's agents as to the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in the United States and in Virginia.    Volkswagen America, Audi AG, and Audi America carried out the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in Virginia as Volkswagen AG's agent.    Volkswagen America's, Audi AG's, and Audi America's actions in, and contacts with, Virginia can be imputed to Volkswagen AG because of the agency relationship between and among those parties.

188.    As set forth below, Volkswagen America, Audi AG, and Audi America are the alter egos of Volkswagen AG because there is (1) a unity of interest and ownership; and (2) Volkswagen AG used Volkswagen America, Audi AG, and Audi America to evade a personal obligation in Virginia, to perpetrate fraud or a crime in Virginia, and to commit an injustice in Virginia, and to gain an unfair advantage in Virginia. Volkswagen AG used Volkswagen America, Audi AG, and Audi America in Virginia as its alter egos for the marketing, promotion, sale and distribution of the Fraudulent Vehicles in the United States and in Virginia.    Volkswagen of America, a wholly owned subsidiary of Volkswagen AG and located in Virginia exists solely to promote the sale and distribution of Volkswagen AG and Audi AG products, including the Fraudulent Vehicles, in the

United States and Virginia. Volkswagen America's, Audi AG's, and Audi America's actions in, and contacts with, Virginia can be imputed to Volkswagen AG pursuant to an alter ego theory.

189.    At all relevant times herein, Volkswagen AG, Audi AG, Volkswagen America, and Audi America operated a joint venture (the "Joint Venture" or "Volkswagen") in Virginia having agreed to assist each other in designing, importing, distributing, marketing and selling certain motor vehicles in the United States, including the Fraudulent Vehicles at issue in this lawsuit. At the critical stages in the foregoing activities, Defendants acted as agents for each other in Virginia in pursuing their common goal of selling the Fraudulent Vehicles in the United States and Virginia. Each Defendant maintained a voice in the control and management of the Joint Venture in Virginia, and each shared in the profits and losses of the Joint Venture in Virginia. The Joint Venture arose in Virginia and is centered in Virginia, and therefore, Virginia law controls the rights and liabilities of the Joint Venture vis-à-vis third parties. Under Virginia law, the Joint Venture is treated as a partnership, and under applicable Virginia partnership law, each partner is jointly and severally liable for the tortious acts of the partnership committed in furtherance of the enterprise. Va. Code § 50-73.96. Given the foregoing, Defendants are jointly and severally liable for tortious acts of each other relating to the business of the Joint Venture. Volkswagen America's, Audi AG's, and Audi America's actions in, and jurisdictional contacts with, Virginia are imputed to Volkswagen AG by virtue of the Joint Venture.

190.    Even if there was no parent-subsidiary relationship between Volkswagen AG and Volkswagen America, personal jurisdiction would still be proper over Volkswagen AG because of Volkswagen AG's own contacts with Virginia with regard to the fraud that forms the basis of this lawsuit. Volkswagen AG sold to Volkswagen America, a Virginia-based corporation, both directly and indirectly (through Audi AG), the Fraudulent Vehicles with the knowledge and intent

that Volkswagen America would resell and distribute them to Plaintiffs and throughout the United States.  Further, Volkswagen AG worked with and directed Volkswagen America in Virginia to advertise and market the Fraudulent Vehicles to Plaintiffs.  Volkswagen AG used its own employees and directed Volkswagen America to formulate and disseminate false information about the Fraudulent Vehicles from Virginia.  Volkswagen AG not only directed Volkswagen America  and Audi America employees in Fairfax County, Virginia to carry out the fraud, but Volkswagen AG sent its own employees to Virginia to carry out and perpetrate the fraud that forms the basis of this lawsuit.  Volkswagen AG and Audi AG required Volkswagen America to use false information about the Fraudulent Vehicles in marketing campaigns developed in Fairfax County, Virginia.  Volkswagen AG and Audi AG employees came to Virginia to develop and promote these campaigns.

191.    The Fraudulent Vehicles were marketed through Volkswagen America, which agreed to serve as the sales agent for Volkswagen AG and Audi AG in Virginia.  Volkswagen America set up a nationwide distribution network that was certain to bring the Fraudulent Vehicles into Virginia.  That distribution network specifically targeted Plaintiffs, all of whom purchased their Fraudulent Vehicles in Virginia.

192.    Volkswagen AG's relationship with Volkswagen America goes far beyond that of a mere parent-subsidiary relationship.  Volkswagen AG exercises significant and total control over Volkswagen America's day to day operations in Virginia, and exercised total control over Volkswagen America in Virginia in directing and carrying out the fraud that forms the basis of this lawsuit.  Indeed, Volkswagen AG's control is so persistent and total that numerous courts across the country have found that Volkswagen America is the proper agent for service of process for Volkswagen AG.

193.    Volkswagen AG is also the parent company of Audi AG.  Volkswagen AG exercises significant control over Audi AG's day-to-day operations.  Audi AG exercises significant control over Volkswagen America with respect to the Fraudulent Vehicles.

194.    In order to sell the Fraudulent Vehicles in the United States and Virginia, Volkswagen AG appointed its wholly-owned Virginia-based subsidiary, Volkswagen America, to transact and manage the business affairs of importing, distributing, marketing and the sale of Volkswagen AG vehicles, including the Fraudulent Vehicles in the United States.  Volkswagen AG further caused Audi AG, one of its German subsidiaries, to appoint Volkswagen America to transact and manage the business affairs of importing, distributing, marketing and the sale of Audi AG vehicles, including the Fraudulent Vehicles in the United States.  Both Volkswagen America and Audi America carried out these activities from their corporate headquarters in Fairfax County, Virginia.  Pursuant to these agreements, Volkswagen AG and Audi AG sold the Fraudulent Vehicles, along with hundreds of thousands of other vehicles to Volkswagen America, a Virginia-based corporation, for distribution throughout the United States and Virginia.  Among those vehicles were the Fraudulent Vehicles owned by Plaintiffs herein.  All of this was accomplished, and the Fraudulent Vehicles were sold to Plaintiffs, pursuant to two Importer Agreements, one of which was between Volkswagen AG and Volkswagen America (the "Volkswagen Importer Agreement") and the other of which was between Audi AG and Volkswagen America (the "Audi Importer Agreement").  These Importer Agreements were not arms-length transactions. Volkswagen AG required Audi AG and Volkswagen America to enter into these agreements.

195.    Though the Audi Importer Agreement is between Volkswagen America and Audi AG, Volkswagen AG exercises such extensive and pervasive control over both parties that it should be considered a party to the Audi Importer Agreement.  In practical terms, Volkswagen AG

exercises all of the powers and authorities provided to Audi AG pursuant to the Audi Importer Agreement and thus indirectly controls Volkswagen America through the Audi Importer Agreement. Volkswagen AG exercised its powers through the Audi Importer Agreement and the Volkswagen Importer Agreement to carry out in Virginia the fraud that forms the basis of this lawsuit.

196.    The Importer Agreements appoint Volkswagen America as the sole authorized U.S. importer and distributor of vehicles manufactured by Volkswagen AG and Audi AG. Volkswagen America agreed to assume responsibility for the importation, distribution, marketing and sale of Volkswagen and Audi vehicles, including the Fraudulent Vehicles. Volkswagen America was the sole authorized U.S. importer and distributor of the Fraudulent Vehicles, as well as other vehicles manufactured by Volkswagen AG and Audi AG, and Volkswagen America obtained the Certificates of Conformity that allowed Volkswagen AG and Audi AG to sell the Fraudulent Vehicles, and all their vehicles, in the United States. With regard to the Fraudulent Vehicles, Volkswagen America carried out its duties and responsibilities to Volkswagen AG and Audi AG under the Importer Agreements in Fairfax County, Virginia at the direction of Volkswagen AG and Audi AG, and with their direct participation in Fairfax County, Virginia.

197.    The Importer Agreements divide functions and promote the common purpose of selling Volkswagen and Audi vehicles, including the Fraudulent Vehicles, throughout the United States. Pursuant to these agreements, Volkswagen AG had the right and power to control the means and methods by which Volkswagen America performed its work in marketing, sales, promotion and public relations and did in fact exercise such power and control over Volkswagen America in Fairfax County, Virginia. Volkswagen AG oversaw and controlled all of the details

of Volkswagen America's marketing, sales, promotion and public relations concerning the Fraudulent Vehicles, which occurred in Virginia.

198.    The Importer Agreements required Volkswagen America to establish a dealer network based on Volkswagen AG's and Audi AG's schedule and conditions. It was this extensive dealer network that allowed Volkswagen AG to sell the Fraudulent Vehicles to Plaintiffs and other consumers throughout the U.S., including Virginia. Volkswagen America established this dealer network from its headquarters in Fairfax County, Virginia at the direction, and with the direct participation, of Volkswagen AG and Audi AG in Fairfax County, Virginia.

199.    Volkswagen AG appointed Volkswagen America to transact and manage the business affairs of importing, distributing, marketing and the sale of the Fraudulent Vehicles, as well as other Volkswagen and Audi vehicles. This activity was carried out by Volkswagen America in Fairfax County, Virginia. Volkswagen AG, Audi AG, Volkswagen America, and Audi America divided functions and worked together in Virginia for the common purpose of selling Volkswagen and Audi vehicles, including the Fraudulent Vehicles. Pursuant to their agreements, Volkswagen AG had the right and power to control the means and methods by which Volkswagen America performed its work in the marketing, sales, promotion and public relations concerning the Fraudulent Vehicles. Volkswagen AG could not conduct business in the United States or Virginia, either directly or indirectly through Audi AG, without the assistance of Volkswagen America. Volkswagen AG controls the methods and details of Volkswagen America's work in Virginia to such an extent that Volkswagen America is the agent of Volkswagen AG in Virginia.

200.    The following additional facts further demonstrate the total control Volkswagen AG exercises over Volkswagen America, either directly or indirectly through Audi AG, in Virginia making the subsidiary nothing more than a Virginia corporate division of Volkswagen AG

29

- Volkswagen AG owns 100% of the outstanding stock of Volkswagen America;

- Volkswagen AG elects and controls the board of directors and the chairman of the board of directors of Volkswagen America in Virginia ;

- Volkswagen America is the sole authorized U.S. importer and distributor of vehicles manufactured by Volkswagen AG and Audi AG and imported and distributed from Virginia the Fraudulent Vehicles both in the United States and in Virginia;

- From the corporate headquarters in Virginia, Volkswagen America officials participated in the obtaining of the Certificates of Conformity that allowed Volkswagen AG and Audi AG to sell their vehicles, including the Fraudulent Vehicles, in the United States and Virginia;

- Volkswagen America is required to, and does in fact, promote the image and good reputation of Volkswagen AG and Audi AG, which occurs from its corporate headquarters in Virginia and which was done in furtherance of the fraud that forms the basis for this lawsuit;

- Volkswagen America is prohibited by Volkswagen AG and Audi AG from modifying any of Volkswagen AG's or Audi AG's vehicles, including the Fraudulent Vehicles, without their prior written approval;

- Volkswagen AG is authorized, both directly and indirectly through Audi AG, by Volkswagen America to control the means and methods by which Volkswagen America marketed and sold Volkswagen AG's and Audi AG's vehicles, including the Fraudulent Vehicles. Volkswagen AG exercises this control at and through Volkswagen America's corporate headquarters in Virginia. A significant portion of the false and misleading representations about the Fraudulent Vehicles were developed in, and disseminated from, Fairfax County, Virginia;

- Volkswagen America is prohibited by Volkswagen AG and Audi AG from selling, marketing or promoting vehicles manufactured by companies other than Volkswagen AG and Audi AG;

- Volkswagen America is required by Volkswagen AG and Audi AG to sell and service used cars at its U.S. dealerships and to take used cars in trade;

- Volkswagen AG determines, both directly and indirectly through Audi AG, the warranty offered on the cars sold by Volkswagen America, including the warranty offered on the Fraudulent Vehicles;

- Volkswagen America is required by Volkswagen AG to lease cars, including Fraudulent Vehicles that were leased to Plaintiffs;

- Volkswagen America is required to establish marketing and public relations objectives and strategies within the guidelines established by Volkswagen AG. These objectives and strategies using false information to market the Fraudulent Vehicles were established at Volkswagen America's corporate headquarters in Virginia;

- Volkswagen AG controls Volkswagen America's advertising content as well as how much money it spends on advertising, including advertising concerning the Fraudulent Vehicles. Such advertising content for the Fraudulent Vehicles was developed at Volkswagen America's corporate headquarters in Virginia;

- Volkswagen America is required by Volkswagen AG and Audi AG to make warranty repairs on all Volkswagen AG and Audi AG vehicles, including the Fraudulent Vehicles, in accordance with Volkswagen AG's guidelines and procedures;

- Volkswagen America is required by Volkswagen AG to use the workshop tools and equipment specified by Volkswagen AG and Audi AG to service vehicles, including the Fraudulent Vehicles;

- Volkswagen America is required by Volkswagen AG to perform all repairs and maintenance work in accordance with Volkswagen AG's and Audi AG's guidelines and procedures;

- Volkswagen America is required to perform its pre-delivery inspections of Volkswagen AG's and Audi AG's vehicles, including the Fraudulent Vehicles, according to Volkswagen AG's and Audi AG's instructions and guidelines;

- Volkswagen America is required to ensure that its standardized data processing and communications programs are compatible with Volkswagen AG's and Audi AG's standardized data processing and communications programs;

- Volkswagen America is required to maintain a modern computer communications system for processing warranty claims that is compatible with Volkswagen AG's system to enable Volkswagen AG and Audi AG to track warranty cost projections;

- Volkswagen America is required to submit to Volkswagen AG and Audi AG on a regular basis information requested by Volkswagen AG and Audi AG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their import agreement;

31

- Volkswagen America is required to inform Volkswagen AG and Audi AG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements;

- Volkswagen America provides regular reports to Volkswagen AG and Audi AG on the development of the market generally and its business activities in the U.S., including reports on the Fraudulent Vehicles. Volkswagen America provides such information to Volkswagen AG and Audi AG from its headquarters in Virginia;

- Volkswagen America and Volkswagen AG determine the profit margin Volkswagen America received on the sale of the Fraudulent Vehicles, as well as on its sale of other Volkswagen cars; and

- Volkswagen America cannot, without written approval of Volkswagen AG, enter into any agreements or arrangements to promote the sale of goods or services from its business premises unless such activities do not affect in any regard Volkswagen AG's business interests.

201. One of the many ways that Volkswagen AG directly managed and controlled Volkswagen America's affairs in Virginia, including the fraud that forms the basis for this lawsuit, is through an expatriate program wherein Volkswagen AG and Audi AG officers and employees were assigned to work for Volkswagen America at Volkswagen America's corporate headquarters in Fairfax County, Virginia. Volkswagen AG and Audi AG employees came to Volkswagen America's corporate headquarters in Virginia and directed, controlled, and participated in the fraud that forms the basis of this lawsuit in Virginia. Volkswagen AG's expatriate officers and employees in Virginia oversaw Volkswagen America's operations, including its marketing, promotion, and distribution of the Fraudulent Vehicles. For example, Volkswagen AG used the expatriate program to appoint Michael Horn as Volkswagen America's CEO. Volkswagen AG used Michael Horn and other German expatriates to manage and control Volkswagen America's operations in Virginia, including the distribution of the Fraudulent Vehicles to Plaintiffs and the marketing and advertising of the Fraudulent Vehicles to Plaintiffs.

202.    Further, Volkswagen AG trains and assigns Volkswagen America employees to work in Fairfax, Virginia.  Volkswagen AG further uses Volkswagen America's headquarters in Fairfax County, Virginia to further its business interests including the marketing, sale, and distribution of the Fraudulent Vehicles to Plaintiffs.

## Personal Jurisdiction over Audi AG

203.    Personal jurisdiction over Audi AG is proper because Audi AG acted both directly and indirectly to (1) transact business in Virginia; (2) supply services or things in Virginia; (3) cause tortious injury by an act or omission in Virginia; and (4) cause tortious injury in Virginia by an act or omission outside Virginia and regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in Virginia. *See* Va. Code Ann. 8.01-328.1.

204.    Personal jurisdiction over Audi AG is proper because of Audi AG's own direct contacts with the state of Virginia concerning the fraud that forms the basis of this lawsuit. Personal jurisdiction over Audi AG is further proper because the Virginia contacts of Volkswagen America, Audi America, and Volkswagen AG concerning the fraud that forms the basis of this lawsuit can be imputed to Audi AG pursuant to the agency relationship between and among the parties, alter ego, conspiracy theory, and joint venture.

205.    As set forth below, Volkswagen America and Audi America are the agents, both actual and implied, of Audi AG and were Audi AG's agents as to the marketing, promotion, sale and distribution of the Fraudulent Vehicles in the United States and in Virginia.  Volkswagen America and Audi America carried out the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in Virginia as Audi AG's agent.  Volkswagen America's and Audi America's

actions in, and contacts with, Virginia can be imputed to Audi AG because of the agency relationship between and among those parties.

206.    As set forth below, Volkswagen America is the alter ego of Audi AG because there is (1) a unity of interest and ownership between Audi AG and Volkswagen America; and (2) Audi AG used Volkswagen America to evade a personal obligation in Virginia, to perpetrate fraud or a crime in Virginia, and to commit an injustice in Virginia, and to gain an unfair advantage in Virginia. Audi AG used Volkswagen America as its alter ego for the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in the United States and in Virginia.   Volkswagen America, a wholly owned subsidiary of the parent company of Audi AG and located in Virginia, exists solely to promote the sale and distribution of Volkswagen AG and Audi AG products, including the Fraudulent Vehicles, in the United States and Virginia.   Volkswagen America's actions in, and contacts with, Virginia can be imputed to Audi AG pursuant to an alter ego theory.

207.    At all relevant times herein, Volkswagen AG, Audi AG, Volkswagen America, and Audi America operated a joint venture (the "Joint Venture" or "Volkswagen") in Virginia having agreed to assist each other in designing, importing, distributing, marketing and selling certain motor vehicles in the United States, including the Fraudulent Vehicles at issue in this lawsuit. At the critical stages in the foregoing activities, Defendants acted as agents for each other in Virginia in pursuing their common goal of selling the Fraudulent Vehicles in the United States and Virginia. Each Defendant maintained a voice in the control and management of the Joint Venture in Virginia, and each shared in the profits and losses of the Joint Venture in Virginia.  The Joint Venture arose in Virginia and is centered in Virginia, and therefore, Virginia law controls the rights and liabilities of the Joint Venture vis-à-vis third parties. Under Virginia law, the Joint Venture is treated as a partnership, and under applicable Virginia partnership law, each partner is jointly and severally

liable for the tortious acts of the partnership committed in furtherance of the enterprise. Va. Code § 50-73.96. Given the foregoing, Defendants are jointly and severally liable for tortious acts of each other relating to the business of the Joint Venture. Volkswagen America's, Volkswagen AG's, and Audi America's actions in and jurisdictional contacts with Virginia are imputed to Audi AG by virtue of the Joint Venture.

208. Even without attributing the contacts of Volkswagen America, Volkswagen AG, and Audi America, personal jurisdiction would still be proper over Audi AG because of Audi AG's own contacts with Virginia. Audi AG sold to Volkswagen America, a Virginia-based corporation, the Fraudulent Vehicles, along with hundreds of thousands of Audi-branded automobiles, with the knowledge and intent that Volkswagen America would resell and distribute them to Plaintiffs and throughout the United States. Further, Audi AG worked with and directed Volkswagen America in Virginia to advertise and the market the Fraudulent Vehicles to Plaintiffs. Audi AG used its own employees and directed Volkswagen America and Audi America to formulate and disseminate false information about the Fraudulent Vehicles from Virginia. Audi AG not only directed Volkswagen America and Audi America employees in Fairfax County, Virginia to carry out the fraud, but Audi AG sent its own employees to Virginia to carry out and perpetrate the fraud that forms the basis of this lawsuit. Audi AG required Volkswagen America to use false information about the Fraudulent Vehicles in marketing campaigns developed in Fairfax County, Virginia. Volkswagen AG and Audi AG employees came to Fairfax County, Virginia to develop these campaigns. Audi AG exercises significant control over Volkswagen America's day to day operations in Virginia with respect to the Fraudulent Vehicles and exercised control over Volkswagen America and Audi America in Virginia in directing and carrying out the fraud that forms the basis of this lawsuit.

209.    In order to sell the Fraudulent Vehicles in the United States and Virginia, Audi AG appointed Volkswagen America to transact and manage the business affairs of importing, distributing, marketing and the sale of Audi AG vehicles in the United States, including the Fraudulent Vehicles.  Pursuant to this agreement, Audi AG sold hundreds of thousands of vehicles to Volkswagen America, a Virginia-based corporation, for dissemination throughout the United States and Virginia.  Among those vehicles were the Fraudulent Vehicles owned by Plaintiffs herein.  This was accomplished pursuant to an Importer Agreement between Audi AG and Volkswagen America, which appointed Volkswagen America as the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG, including the Fraudulent Vehicles. Volkswagen America agreed to assume responsibility for the importation, distribution, marketing and sale of Audi AG's vehicles, including the Fraudulent Vehicles.  Volkswagen America was the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG.  From their corporate headquarters in Virginia, Volkswagen America and Audi America officials participated in obtaining the Certificates of Conformity that allowed Audi AG to sell the Fraudulent Vehicles, and all of their vehicles in the United States.  With regard to the Fraudulent Vehicles, Volkswagen America carried out its duties and responsibilities to Audi AG under the Audi Importer Agreement in Fairfax County, Virginia at the direction of Audi AG, and with its direct participation in Fairfax County, Virginia.

210.    By agreement, Audi AG and Volkswagen America divided functions and worked together for the common purpose of selling the Fraudulent Vehicles, as well as Audi vehicles throughout the United States.  Pursuant to their agreement, Audi AG had the right and power to control the means and methods by which Volkswagen America performed its work in marketing, sales, promotion and public relations and did in fact exercise such power and control and control

over Volkswagen America in Fairfax County, Virginia. Audi AG oversaw and controlled all of the details of Volkswagen's America's marketing, sales, promotion and public relations concerning the Fraudulent Vehicles, which occurred in Virginia.

211.    The Importer Agreement between Audi AG and Volkswagen America required Volkswagen America to establish a dealer network based on Audi AG's schedule and conditions. It was this extensive dealer network that allowed Audi AG to sell the Fraudulent Vehicles to Plaintiffs and other consumers throughout the U.S., including Virginia. Volkswagen America established this dealer network from its headquarters in Fairfax County, Virginia at the direction, and with the direct participation, of Audi AG in Fairfax County, Virginia.

212.    Audi AG appointed Volkswagen America to transact and manage the business affairs of importing, distributing, marketing and the sale of the Fraudulent Vehicles, as well as other Audi AG vehicles. This activity was carried out by Volkswagen America in Fairfax County, Virginia. Audi AG and Volkswagen America divided functions and worked together in Virginia for the common purpose of selling Volkswagen vehicles, including the Fraudulent Vehicles. Pursuant to their agreements, Audi AG had the right and power to control the means and methods by which Volkswagen America performed its work in marketing, sales, promotion and public relations concerning the Fraudulent Vehicles. Audi AG could not conduct business in the United States or Virginia without the assistance of Volkswagen America. Audi AG controls the methods and details of Volkswagen America's work in Virginia to such an extent that Volkswagen America is the agent of Audi AG in Virginia.

213.    The following additional facts further demonstrate the control Audi AG exercises over Volkswagen America in Virginia, making the subsidiary nothing more than a Virginia corporate division of Audi AG.

37

- Audi AG appoints, oversees, and controls officers and managers of directors of Volkswagen America responsible for the distribution of Audi AG vehicles in Virginia;

- Volkswagen America is the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG and imported and distributed from Virginia the Fraudulent Vehicles both in the United States and in Virginia;

- From the corporate headquarters in Virginia, Volkswagen America officials participated in the obtaining of the Certificates of Conformity that allowed Audi AG to sell its vehicles, including the Fraudulent Vehicles, in the United States and Virginia;

- Volkswagen America is required to, and does in fact, promote the image and good reputation of Audi AG, which occurs from its corporate headquarters in Virginia and was done in furtherance of the fraud that forms the basis for this lawsuit;;

- Volkswagen America is prohibited by Audi AG from modifying any of Audi AG's vehicles, including the Fraudulent Vehicles, without its prior written approval;

- Audi AG is authorized by Volkswagen America to control the means and methods by which Volkswagen America marketed and sold Audi AG's vehicles, including the Fraudulent Vehicles. Audi AG exercises this control at and through Volkswagen America's corporate headquarters in Virginia. A significant portion of the false and misleading representations about the Fraudulent Vehicles were developed in, and disseminated from, Fairfax County, Virginia;

- Volkswagen America is prohibited by Audi AG from selling, marketing or promoting vehicles manufactured by companies other than Audi AG;

- Volkswagen America is required by Audi AG to sell and service used cars at its U.S. dealerships and to take used cars in trade;

- Audi AG determines the warranty offered on the cars sold by Volkswagen America, including the warranty offered on the Fraudulent Vehicles;

- Volkswagen America is required by Audi AG to lease cars, including Fraudulent Vehicles that were leased to Plaintiffs;

- Volkswagen America is required to establish marketing and public relations objectives and strategies within the guidelines established by Audi AG. These objectives and strategies using false information to market the Fraudulent Vehicles were established at Volkswagen America's corporate headquarters in Virginia;

38

- Audi AG controls Volkswagen America's advertising content as well as how much money it spends on advertising, including advertising concerning the Fraudulent Vehicles. Such advertising content for the Fraudulent Vehicles was developed at Volkswagen America's corporate headquarters in Virginia;

- Volkswagen America is required by Audi AG to make warranty repairs on all Audi AG vehicles, including the Fraudulent Vehicles, in accordance with Audi AG's guidelines and procedures;

- Volkswagen America is required by Audi AG to use the workshop tools and equipment specified by Audi AG to service vehicles, including the Fraudulent Vehicles;

- Volkswagen America is required by Audi AG to perform all repairs and maintenance work in accordance with Audi AG's guidelines and procedures;

- Volkswagen America is required to perform its pre-delivery inspections of Audi AG's vehicles, including the Fraudulent Vehicles, according to Audi AG's instructions and guidelines;

- Volkswagen America is required to ensure that its standardized data processing and communications programs are compatible with Audi AG's standardized data processing and communications programs;

- Volkswagen America is required to maintain a modern computer communications system for processing warranty claims that is compatible with Audi AG's system to enable Audi AG to track warranty cost projections;

- Volkswagen America is required to submit to Audi AG on a regular basis information requested by Audi AG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their import agreement;

- Volkswagen America is required to inform Audi AG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements;

- Volkswagen America provides regular reports to Volkswagen AG and Audi AG on the development of the market generally and its business activities in the U.S., including reports on the Fraudulent Vehicles. Volkswagen America provides such information to Audi AG from its headquarters in Virginia;.

39

- Volkswagen America and Audi AG determine the profit margin Volkswagen America received on the sale of the Fraudulent Vehicles, as well on its sale of other Audi cars; and

- Volkswagen America cannot, without written approval of Audi AG, enter into any agreements or arrangements to promote the sale of goods or services from its business premises unless such activities do not affect in any regard Audi AG's business interests.

214. One of the many ways that Audi AG managed and controlled Volkswagen America's affairs in Virginia, including the fraud that forms the basis of this lawsuit, is having officers and employees of Volkswagen America report to officials at Audi AG.

215. Audi AG exercised direct supervisory control over Volkswagen America in Virginia.

216. One of the many ways that Audi AG directly managed and controlled Volkswagen America's affairs in Virginia, including the fraud that forms the basis of this lawsuit, is through an expatriate program wherein Audi AG officers and employees were assigned to work for Volkswagen America at Volkswagen America's corporate headquarters in Fairfax County, Virginia. Audi AG employees came to Volkswagen America's corporate headquarters in Virginia and directed, controlled, and participated in the fraud that forms the basis of this lawsuit in Virginia. Audi AG's expatriate officers and employees in Virginia oversaw Volkswagen America's operations, including its marketing, promotion, and distribution of the Fraudulent Vehicles. Audi AG used German expatriates to manage and control Volkswagen America's operations in Virginia, including the dissemination of the Fraudulent Vehicles to Plaintiffs and the marketing and advertising of the Fraudulent Vehicles to Plaintiffs.

217. Further, Audi AG trains and assigns Volkswagen America employees to work in Fairfax, Virginia. Audi AG further uses Volkswagen America's headquarters in Fairfax County,

Virginia to further its business interests, including the marketing, sale, and distribution of the Fraudulent Vehicles to Plaintiffs.

218.    Venue is proper in the Circuit Court of Fairfax County for the claims asserted herein. The cause of action, or part thereof, arose in Fairfax County.

## JURY TRIAL DEMAND

219.    Plaintiffs request a jury trial of this matter.

## FACTUAL BACKGROUND

### The Basics

220.    This lawsuit is about a fraudulent deceptive scheme to deliberately lie, cheat and intentionally deceive consumers about the characteristics, benefits and value of certain automotive vehicles (referred to herein as the "Deceptive Emissions Scheme"). The Deceptive Emissions Scheme involved a number of Audi gasoline vehicles (collectively referred to as the "Fraudulent Vehicles"), including those acquired by Plaintiffs and described above. The Fraudulent Vehicles include, without limitation, the following Audi gasoline vehicles: (1) Audi A6 2012-2016; (2) Audi A7 2012-2016; (3) Audi A8 and A8L 2012-2016; and (4) Audi Q5 2013-2016.

221.    The centerpiece of the Deceptive Emissions Scheme was the use of, in the Fraudulent Vehicles, a secretly embedded software algorithm that was designed and installed to cheat emission tests (herein referred to as the "Cheat Device"), thereby tricking and defrauding consumers into buying and/or leasing more than a hundred thousand Fraudulent Vehicles.

222.    The Cheat Device detects when the engines in the Fraudulent Vehicles are being tested in a laboratory or smog station and trigger performance-sapping controls to simulate compliance with the $CO_2$ levels that the Audi Gasoline Defendants represented under testing conditions. But when the test ends, and the driver returns to the road under normal operation and

use, the performance—and thehigher levels of CO2 emissions—return.    In short, the Audi Gasoline Defendants figured out a computer-driven methodology and technique to cheat the emissions system--simply run the vehicle in an eco-friendly compliant mode when being tested and in normal dirty mode when it was out on the road ways being driven by consumers.  Plain and simple:  it was an intentional plan, scheme and design to lie and cheat consumers, including Plaintiffs in this lawsuit.

223.    For years, the defendants got away with Deceptive Emissions Scheme, including the Cheat Device, without detection as Fraudulent Vehicles were sold in large numbers into the stream of commerce. Once out of the testing facilities and on the roads, these cars emit harmful levels of Caron Dioxide ($CO_2$) emissions into the air. When being driven on the road, they also emit more $NO_x$ and carbon monoxide than the levels reported by emission testing and advertised by the Audi Gasoline Defendants.  When being driven on the road, they also achieve less fuel economy than represented and advertised by the Audi Gasoline Defendants.

224.    $CO_2$ is a significant greenhouse gas, and the excessive emission of carbon dioxide is a major cause of global warming and ocean acidification. For this reason, it was important to consumers and the public that Fraudulent Vehicles conform to the representations that the Audi Gasoline Defendants made about the $CO_2$ emissions of the vehicles.

225.    Because of the Audi Gasoline Defendants' actions, the Fraudulent Vehicles that were sold to Plaintiffs are not what the Audi Gasoline Defendants promised. During normal operation, these vehicles pollute the atmosphere with much higher levels of pollutants and greenhouse gases than the artificially-manipulated test results disclose. Meanwhile, when the engine and transmission are operated in a manner that actually limits pollution as represented and

42

advertised, the vehicles cannot deliver the performance that the Audi Gasoline Defendants promised and advertised.

226.    The Audi Gasoline defendants used the Cheat Device to fraudulently conceal the fact that the Fraudulent Vehicles had much higher $CO_2$ emissions that represented and advertised. The Audi Gasoline Defendants acted solely in the name of profit and greed and the reprehensibility of cheating and stealing from their own consumers was of no consideration.

227.    Plaintiffs in this lawsuit were duped – plain and simple.  They got sucked in by the Defendants' lies and fraudulent scheme and acquired their Fraudulent Vehicles based on the patently false representations that the vehicles had low emissions, got good gas mileage, and complied with federal, state, and local emissions laws and regulations.

228.    All of the defendants in this lawsuit played a role and participated in the Deceptive Emissions Scheme, including the creation, use, and deception related to the Cheat Device.

229.    All of the plaintiffs in this lawsuit acquired one of the Fraudulent Vehicles without knowledge of Deceptive Emissions Scheme or the Cheat Device.

230.    The Deceptive Emissions Scheme, including the Cheat Device, was dastardly.

231.    The Deceptive Emissions Scheme, including the Cheat Device, violated Virginia law.

232.    The Deceptive Emissions Scheme, including the Cheat Device, was intentionally designed to defraud and cheat consumers, including Plaintiffs – which it did.

**Defendants' Scheme to Install Defeat Devices**

233.    The history of the Audi Gasoline Defendants' development of the gasoline Cheat Device is not as publicly known as the history of their now-infamous diesel defeat device that became known as the "Dieselgate" scandal.  From what is known now, though, it appears the Audi

43

Gasoline Defendants developed the Cheat Device at issue in this lawsuit concurrently with their diesel cheat device as part of an overall fraudulent scheme to deal with emissions engineering problems through cheating and deception.

234.    Since 2011, CO2 emissions standards have been increasing, putting increasing pressure on automobile manufacturers, like the Audi Gasoline Defendants, to design and development more environmentally friendly vehicles.

235.    The Audi Gasoline Defendants were aware that emissions and fuel consumption are decisive factors for customers making vehicle purchase decisions. To that end the Audi Gasoline Defendants began to mislead consumers by representing their vehicles as consuming less fuel and emitting less CO2 and other pollutants than they actually do in normal driving conditions.

236.    The Audi Gasoline Defendants were able to disguise this deception by programming the Fraudulent Vehicles with the ability to engage different modes, one of which used significantly less fuel and emitted significantly less pollutants, but also delivered significantly less power. The Audi Gasoline Defendants deceptively labeled this the "warm-up" strategy, a mode that activates when the Fraudulent Vehicles are started.  As long as the "warm-up" function remains activated, the automatic transmission remains in a "switching program" that produces a low engine speed, consumes less fuel, and produces less CO2 and other pollutants. However, this "warm up" mode remains active only until the steering wheel is turned 15 degrees or more, at which point the engine management computer switches the transmission into normal mode, wherein the transmission shifts at normal, higher RPM, offering higher performance, lower fuel economy, and significantly greater carbon dioxide and other pollutant emissions.

237.    During emissions testing, which typically takes place on a dynamometer, the car remains in "warm-up" mode indefinitely, because the steering wheel is not turned.  Meanwhile, in

normal driving conditions, any turn that requires the steering wheel to be rotated more than 15 degrees, and the car switches to its normal shifting program, resulting in lower fuel economy, and significantly greater carbon dioxide emissions and other pollutants.

238.    In February 2013, the Audi Gasoline Defendants tested their cars in the "SummerFahrt," or Summer Drive, in South Africa. The final report reflected that the shift quality and issues at the start were noticeable. It was in this report that Audi engineer Axel Eiser made his now-notorious comment that the cycle-optimized "shifting program" was to be set to operate 100% when being tested, and be noticeable only .01% of the time when driven normally.

239.    The defeat device software is embedded in the Transmission Control Module ("TCM"). The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work in tandem to execute the actual cheat function. The engineers embedded the cheat software in the TCM unit, intentionally making its detection less probable

240.    Volkswagen and Audi engineers figured out how to activate this low fuel, low emissions, low power "warm-up" mode during emissions tests. They discovered that only time the Fraudulent Vehicles would run continuously with no steering wheel input would be when the vehicles were undergoing examination in a lab, on a dynamometer. When sensors detect these lab conditions, the vehicles' TCM set "shift points"—the engine speeds at which the transmission shifts up to the next gear—that allow the vehicles to produce compliant emission results under those conditions (known by Audi as the "dyno calibration" mode). Thus, on a dynamometer, where the steering wheel is never turned, the Cheat Device enables the Fraudulent Vehicles to operate in this low power mode.

241.    At all other times—that is, when the Fraudulent Vehicles are actually driving under normal conditions—the transmission computer switches to "road calibration" mode, which offers full power to the driver, and which results in increased fuel consumption and greater emissions. Indeed, the road calibration mode activates once the driver turns the steering wheel 15 degrees, something that happens almost immediately under nearly all normal driving conditions.

242.    This Deceptive Emission Scheme allowed the Audi Gasoline Defendants to deceive Plaintiffs and the public about  the Fraudulent Vehicles' fuel consumption and emissions levels.

243.    A vehicle's advertised fuel economy, which is listed on the "Monroney sticker," or window sticker, is determined by driving a vehicle over five standardized driving patterns (or drive cycles), all of which are performed in a laboratory on a dynamometer where the conditions for all tests can be controlled. During each of the drive cycles, the Fraudulent Vehicles were assessed under a low power, low emissions, low fuel consumption mode.  Based on the way the Monroney sticker is calculated, as the amount of $CO_2$ produced increases, the gasoline used increases and the fuel economy decreases. Therefore, if a vehicle produces less $CO_2$ during laboratory testing, but higher $CO_2$ when driven on road, the vehicle would have better estimated fuel economy represented on the Monroney sticker than the vehicle would actually achieve on the road.  That is exactly what happened here with regard to the Fraudulent Vehicles.  The Cheat Device essentially tricked the Monroney testing into giving the false impression that the Fraudulent Vehicles had better mileage and lower emissions levels than they did.

244.    There is no question that the Audi Gasoline Defendants knew what they were doing. Indeed, they commissioned their own study at one point and found that certain Fraudulent Vehicles' fuel consumption on the road increased by 8.5 percent after the wheel was turned.

245.    The Audi Gasoline Defendants' developed the Cheat Device because they could not deliver all that they promised Plaintiffs with the Fraudulent Vehicles.  By improving fuel economy and complying with the promised $CO_2$ emissions levels, the Audi Gasoline Defendants found that the resulting driving experience was unacceptable in light of its advertised emphasis on performance.  The Audi Gasoline Defendants decided to conceal the low-power mode from the consumer, including Plaintiffs, and make it active, in effect, only when the vehicles were undergoing emissions testing—when the steering wheel is not turned. Audi executives were aware of the risk that consumers would complain about the discrepancy between advertised fuel economy achieved during certification testing and what they would experience in the real world but nonetheless elected to conceal the "low-power" mode from consumers.

**The Discovery of the Cheat Device**

246.    In late 2015 or early 2016, German authorities—namely, the German Motor Transportation Authority ("KBA")—detected irregularities and increased $CO_2$ emissions in Audi vehicles and questioned Audi about these results.  The Audi Gasoline Defendants lied to the KBA, however, telling them that their vehicles would not contain software allowing them to detect dynamometer testing and alter the vehicles' performance as a result. The Audi Gasoline Defendants instead pointed to a number of factors that could have distorted the measurement results.

247.    German authorities continued to press forward, however, and renewed their investigations.

248.    Audi executives were on notice of the potential for $CO_2$ emissions manipulation well before the Audi $CO_2$ defeat device was publicized. Following the public revelation of the diesel defeat device in the "Clean Diesel" vehicles in September 2015 by CARB and EPA, another

47

investigation began to unfold, this one relating to CO2. In November 2015, new Volkswagen CEO Matthias Müller announced that internal investigations had identified irregularities in CO2 levels, and that around 800,000 Group vehicles could be affected. A Volkswagen announcement did not specifically identify the vehicles, but stated in relevant part: "…during the course of internal investigations irregularities were found when determining type approval CO2 levels. Based on present knowledge around 800,000 vehicles from the Volkswagen Group could be affected. An initial estimate puts th0e economic risks at approximately two billion euros. The Board of Management of AG will immediately start a dialogue with the responsible type approval agencies regarding the consequences of these findings."

249.    In December 2015, in a statement to investors, Mueller changed course, reporting that the Audi Gasoline Defendants had in fact made a mistake and that there was no such scandal. It was announced that "[t]he suspicion that fuel consumption figures of current production vehicles had been unlawfully changed was not confirmed…These cars can be offered for sale by dealers without any reservations."

250.    More than half a year later, European officials again questioned Defendants about carbon emissions. Even then, Defendants continued to deny a problem. At no point in time did the Audi Gasoline Defendants inform the public or Plaintiffs that they had obtained the COCs and EOs through the use of a CO2 defeat device, or that its emissions and fuel efficiency representations for the Fraudulent Vehicles were false.

251.    Since at least 2013 at Audi and Volkswagen executives were aware and concerned about the CO2 defeat device—including the fact that the software constituted a defeat device—and the risk of investigations. Moreover, Volkswagen's now-former CEO, Martin Winterkorn, knew about the defeat device scheme well before the scandal broke. Indeed, prosecutors in

Germany, are investigating Winterkorn for fraud, believing he had sufficient knowledge of the scheme.

252.    Following the revelations regarding the CO2 defeat device, Audi reportedly suspended several unidentified "responsible engineers." However, Axel Eiser remains Head of Powertrain Development of the Volkswagen Group. Defendants have even relied on Eiser to interface with regulators.

### Publicly Revealed Testing Confirms the Existence of the Cheat Device

253.    Recently, testing of Fraudulent Vehicles by private parties has been made public in court filings. This testing confirms the existence and functionality of the Cheat Device.

254.    Testing was conducted to determine whether there was a difference in fuel economy for certain Fraudulent Vehicles when tested using the federal certification tests, with and without turning the vehicle wheels more than 15 degrees prior to testing. Test results showed that in certain Fraudulent Vehicles, fuel economy was higher with no wheel movement before testing than in testing that followed moving the steering wheel fully to the right and left after engine start and just prior to the drive cycle starting, indicating that steering input triggers a switch between modes. The difference in fuel economy was as high as nine percent between the two modes.

255.    Further testing shows the existence of a defeat device that increases fuel economy (reducing carbon dioxide production) when the steering wheel is not turned, and that it does so by instructing the transmission to shift at lower engine speed, operating at a lower average RPM.

256.    There has also been testing of Fraudulent Vehicles that have been "reflashed" with a software update as part of an emissions recall that received regulatory approval on September 16, 2016. Further, experts have conducted on-road testing on several 3.0L Fraudulent Vehicles

using portable emissions measurement systems ("PEMS"). These tests support conclusion that the Fraudulent Vehicles are equipped with Cheat Devices.

## **Defendants' False Advertising**

257.    In addition to directly falsely advertising to Plaintiffs emissions compliance and fuel economy regarding the Fraudulent Vehicles, the Audi Gasoline Defendants advertised their concern for the environment even while selling vehicles equipped with Defeat Devices that polluted at levels far greater than legal limits. For example, on the "Environment" page of its website, Volkswagen Group of America, Inc., stated as late as September 2015 that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives." That "integrated strategy" for reducing emissions seems to have consisted only of cheating emissions testing so that Volkswagen and Audi vehicles only appeared to offer reduced emissions, while continuing to pollute.

258.    Long after Defendants became aware that many of their vehicles were deliberately designed to cheat emissions tests, and even after EPA and CARB issued Notices of Violation for their diesel vehicles, Defendants continued to mislead consumers. While sales of new diesel vehicles equipped with the diesel defeat device ceased in late 2015, news reports indicate that Audi did not stop producing gasoline vehicles equipped with the Cheat Device until May 2016, a full eight months after the 2015 diesel scandal broke.

259.    Audi television advertisements use the tagline "Truth in Engineering" as their motto. Unfortunately for consumers who bought the Fraudulent Vehicles, the Audi Gasoline Defendants' engineering was far from "truthful," and their professed commitment to

environmental consciousness was illusory. They have designed and sold cars that emit pollutants at breath-taking levels, and they disguised it by engineering them to detect and then cheat on state and federal environmental testing.

**Defendants Intentionally Hid the Excessive Pollution Emitted By the Fraudulent Vehicles.**

260.    Defendants' Defeat Devices are part of a computerized engine control system that monitors sensors throughout the cars' engine, transmission, and exhaust systems and controls operation of the cars' systems to ensure optimal performance. Here, the Audi Gasoline Defendants programmed the engine control computers in the Fraudulent Vehicles with software that effectively detects when the vehicle is undergoing emissions testing by turning off a low-emitting gear-shifting program only once the steering wheel is turned more than fifteen degrees. This ensures that the engine never revs above a certain, unrealistically low engine speed during emissions testing, resulting in less fuel burnt and less carbon dioxide emitted than under normal driving conditions. When the car is not being emissions tested—that is, under the vast majority of normal operating conditions—the engine control systems operate the engine and transmission in a manner that does not comply with EPA or CARB emissions requirements.

261.    In short, this software allows the Fraudulent Vehicles to meet emissions standards in labs or state testing stations while permitting the vehicles to emit carbon dioxide at levels far above the levels represented and advertised by the Audi Gasoline Defendants during normal operation.

262.    The Audi Gasoline Defendants have a history of cheating on emissions. The "Dieselgate" Scandal was not the first time that the Audi Gasoline Defendants allegedly engineered vehicles to cheat emission standards. Volkswagen paid a $120,000 fine to the EPA in

1974 in order to settle charges that "it gamed pollution control systems in four models by changing carburetor settings and shutting off an emissions-control system at low temperatures."

263.     Moreover, Defendants were warned as long ago as 2007 by suppliers and their own employees not to cheat on emissions tests.  In 2007, supplier Bosch warned the Defendants not to use cheat software during regular operation.  Also, in 2011, a technician raised concerns about fraudulent practices in connection with emissions levels.

264.     Despite those warnings, the Audi Gasoline Defendants manufactured, marketed, and sold cars with Defeat Devices designed to allow higher levels of pollutant emissions than those allowed by state and federal law, thus defrauding their customers, including Plaintiffs.

## The Deceptive Emissions Scheme Caused Extensive Harm to Plaintiffs.

265.     The Deceptive Emissions Scheme duped Plaintiffs and consumers into acquiring Fraudulent Vehicles that never should have left the factory, let alone been sold.

266.      In addition, a premium was charged for the Fraudulent Vehicles, as compared to non-luxury, high performance vehicles.

267.     Plaintiffs acquired their Fraudulent Vehicles based on Defendants' fraudulent representations about the vehicles' CO2 emissions and their use of Cheat Devices to conceal those emissions levels from Plaintiffs.  Plaintiffs also acquired their vehicles based on Defendant's false representations and advertisements regarding performance and fuel economy.  Plaintiffs acquired the Fraudulent Vehicles based on these claims, and were harmed as a result.

268.     Defendants' deceptive actions have caused Plaintiffs significant harm. Even if Defendants were to repair the Fraudulent Vehicles so that they comply with emissions requirements, the repair would not compensate Plaintiffs for the significant harm Defendants' deception has caused.  First, any repairs performed as part of the recall are likely to significantly

diminish the performance (and thus the value) of the Fraudulent Vehicles. Specifically, any software "repair" that reprograms the Fraudulent Vehicles to operate within legal emissions limits at all times (and not just during testing) will cause the performance of the Fraudulent Vehicles to suffer, and they will not perform as they were represented, advertised, and marketed to Plaintiffs.

269.    Second, even if a more functional repair is possible (and to date none has been suggested), it could not compensate for the financial damages Plaintiffs have suffered, including the premiums Plaintiffs paid to own high-performing, luxurious Audi-branded vehicles that complied with emissions requirements and comported with Audi's advertised commitment to the environment and the inevitable reduction in resale value caused by any recall to repair the vehicles and any resulting diminished performance.

270.    Third, Plaintiffs are already experiencing reputational harm as they are unwilling accomplices to Defendants' pollution-producing scheme.

271.    For those reasons, as a result of Defendants' unfair, deceptive, and fraudulent business practices, and their failure to disclose that the Fraudulent Vehicles utilize a Cheat Device to cheat emissions tests, owners and/or lessees of the Fraudulent Vehicles, including Plaintiffs, have suffered losses in money and property.

272.    Had Plaintiffs known of the Cheat Device at the time they acquired their Fraudulent Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

273.    Plaintiffs have suffered damages as a result their purchases of the Vehicles, including but not limited to (i) overpayment for a vehicle that is incapable of performing as represented, (ii) future additional fuel costs, (iii) loss of performance from future repairs, and (iv) diminution of vehicle value.

274.    In sum, Defendants' deliberate strategy to value profit over the truth, human health, and the environment, has caused serious harm to consumers nationwide.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

275.    The tolling doctrine was made for cases of fraudulent concealment like this one. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that the defendants had conspired to install software that would evade emissions tests, and that the defendants were concealing and misrepresenting the true emissions levels of their vehicles.

276.    The fraud, as set forth herein, was elaborate and well concealed.

277.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

278.    Plaintiffs could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to disclose information within their knowledge to consumers, dealerships, or others.

279.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of their sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs immediately before this action was filed.

### Fraudulent Concealment

280.    All applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

281.    Upon information and belief, prior to the date of this Complaint and before any Plaintiff acquired his or her Fraudulent Vehicle, if not earlier, the Audi Gasoline Defendants knew of the Cheat Device in the Fraudulent Vehicles, but continued to distribute, sell, and/or lease the Fraudulent Vehicles to Plaintiffs. In doing so, Defendants concealed and expressly denied the existence of problem with $CO_2$ emissions, and/or failed to notify Plaintiffs about the true nature of the vehicles.

282.    Defendants failed to disclose their deception, or that the emissions from the Fraudulent Vehicles were far worse than represented.

283.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge active concealment of the facts alleged herein.

### Estoppel

284.    Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Fraudulent Vehicles, including the fact that the vehicles used Cheat Devices to hide the fact that the vehicles had far higher $CO_2$ emissions than Defendants represented and advertised.

285.    Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs that they had engaged in the deception described in this Complaint, Defendants chose to actively concealed the true character, quality, and nature of the Fraudulent Vehicles, and knowingly made misrepresentations about the quality, reliability, characteristics, and/or performance of the Vehicles.

### American Pipe Tolling

286.    Under the U.S. Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, any applicable statutes of limitation were tolled by

55

the filing of the federal class action complaint in In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation, 3:15-md-02672-CRB (N.D. Cal.).

287.    Based on the foregoing, the Audi Gasoline Defendants are estopped and precluded from relying on any statute of limitations in defense of this action.

## CLAIMS FOR RELIEF

## ARIZONA

288.    Plaintiffs Hassan Aljuaid, Karen Gladstone, Rick Rock, Kristen Powell Rock, (collectively, the "Arizona Plaintiffs") acquired their Fraudulent Vehicles while in the State of Arizona.   As such, they bring the following causes of action against all defendants.

### ARIZONA COUNT 1- FRAUD
### (On behalf of the Arizona Plaintiffs)

289.    The Arizona Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

290.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Arizona Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

291.    The Audi Gasoline Defendants valued their profits over the trust that the Arizona Plaintiffs entrusted to them. The Arizona Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

292.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Arizona Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

293.    Defendants' false representations and omissions were material to the Arizona Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Arizona Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

294.    The Arizona Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Arizona Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Arizona Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

295.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Arizona Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high

performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Arizona Plaintiffs.

296.    Defendants had a duty to disclose the Cheat Device to the Arizona Plaintiffs.

297.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Arizona Plaintiffs, did not know about (and could not reasonably discover) its scheme.

298.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Arizona Plaintiffs.

299.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

300.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Arizona Plaintiffs.

301.    The Arizona Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

302.    The Arizona Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Arizona Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

303.    As a direct and proximate result of Defendants' fraudulent scheme, the Arizona Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

304.    The Arizona Plaintiffs hereby sue Defendant for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial. Defendants' defendant's wrongful conduct was guided by evil motives or willful or wanton

disregard of the interests of others. Defendants' conduct thus warrants substantial punitive damages in an amount to be determined at trial, for which the Arizona Plaintiffs hereby sue Defendants.

## ARIZONA COUNT 2-
### VIOLATIONS OF THE CONSUMER FRAUD ACT
#### (Ariz. Rev. Stat. § 44-1521, et seq.)
#### (On behalf of the Arizona Plaintiffs)

305.    The Arizona Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

306.    The Arizona Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

307.    Defendants and the Arizona Plaintiffs are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

308.    The Fraudulent Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

309.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). Defendants violated the Arizona CFA.

310.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy

test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Arizona Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

311.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Arizona CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

312.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

313.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

314.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Arizona Plaintiffs.

315.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

316.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Arizona CFA.

317.    Defendants owed the Arizona Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Arizona Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Arizona Plaintiffs that contradicted these representations.

318.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

319.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Arizona Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

62

320.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Arizona Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

321.    The Arizona Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Arizona Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Arizona Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

322.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business.

323.    Defendants' violations present a continuing risk to the Arizona Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

324.    The Arizona Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. The Arizona Plaintiffs also sue Defendants for punitive damages because Defendants

engaged in aggravated and outrageous conduct with an evil mind. The Arizona Plaintiffs also sue

Defendants for attorneys' fees and costs and any other just and proper relief available under the

Arizona CFA.

## ARKANSAS

325.    Plaintiffs Jackie Kirby, Geraldine Kirby, Mark Simpson, Rickey Studdard and

Studdard Construction Co., Inc. (collectively, the "Arkansas Plaintiffs") acquired their Fraudulent

Vehicles while in the State of Arkansas.   As such, they bring the following causes of action against

all defendants.

## ARKANSAS COUNT 1- FRAUD
### (On behalf of the Arkansas Plaintiffs)

326.    The Arkansas Plaintiffs incorporate by reference each preceding paragraph as

though fully set forth herein.

327.    As alleged extensively above, the Audi Gasoline Defendants intentionally

concealed and suppressed material facts concerning the illegality and quality of the Fraudulent

Vehicles in order to defraud and mislead the Arkansas Plaintiffs about the true nature of the

Fraudulent Vehicles.   Defendants accomplished their scheme (and the concealment thereof) by

installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the

Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during

testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities

of noxious pollutants and contaminants and achieved less fuel economy that was advertised and

represented.   The result was precisely what the Audi Gasoline Defendants had intended—the

Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false

readings and thus successfully imported and sold and/or leased to unwitting American consumers.

328.    The Audi Gasoline Defendants valued their profits over the trust that the Arkansas Plaintiffs entrusted to them. The Arkansas Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

329.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Arkansas Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

330.    Defendants' false representations and omissions were material to the Arkansas Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Arkansas Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

331.    The Arkansas Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Arkansas Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Arkansas Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

332.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Arkansas Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high

performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Arkansas Plaintiffs.

333.    Defendants had a duty to disclose the Cheat Device to the Arkansas Plaintiffs.

334.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Arkansas Plaintiffs, did not know about (and could not reasonably discover) its scheme.

335.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Arkansas Plaintiffs.

336.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

337.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Arkansas Plaintiffs.

338.    The Arkansas Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

339.    The Arkansas Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Arkansas Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

340.    As a direct and proximate result of Defendants' fraudulent scheme, the Arkansas Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

341.    The Arkansas Plaintiffs hereby sue Defendants for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial.  Defendants' wrongful conduct was willful or so reckless as to be equivalent thereto.

Defendants' conduct thus warrants substantial punitive damages law in an amount to be determined at trial, for which the Arkansas Plaintiffs hereby sue Defendants.

## ARKANSAS COUNT 2-
## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
### (Ark. Code Ann. § 4-88-101, et seq.)
### (On behalf of the Arkansas Plaintiffs)

342.    The Arkansas Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

343.    The Arkansas Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

344.    Defendants and the Arkansas Plaintiffs are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

345.    The Fraudulent Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88- 102(4).

346.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108. Defendants intentionally violated the aforementioned provisions of the Arkansas DTPA.

347.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by

68

Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Arkansas Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

348.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Arkansas DTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

349.     The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

350.     The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the

law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

351.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Arkansas Plaintiffs.

352.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

353.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Arkansas DTPA.

354.    Defendants owed the Arkansas Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Arkansas Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Arkansas Plaintiffs that contradicted these representations.

355.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

356.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Arkansas Plaintiffs.  A vehicle made by

a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

357.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Arkansas Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

358.    The Arkansas Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Arkansas Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Arkansas Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

359.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arkansas DTPA in the course of their business.

360.    Defendants' violations present a continuing risk to the Arkansas Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

361.     The Arkansas Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. The Arkansas Plaintiffs also sue Defendants for punitive damages because Defendants acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.  The Arkansas Plaintiffs further sue Defendants for attorneys' fees and costs plus any other just and proper relief available under the Arkansas DTPA. *See Anderson v. Stewart*, 234 S.W.3d 295, 297 (2006).

## COLORADO

362.     Plaintiffs Steve Calderoni, Kenvir Dixon, Kelli Kirkland, Derrick Dobbin, Michael England, Michelle England, Jason Hansen, James Ladd, Lela Ladd, Edward Marchand, Brigitte Marchand, Greg Martinez, Steven Martinez, Jay McCutchan, Frank McRobbie, Michael Orourke, Thor Wishart, and Karen Wishart (collectively, the "Colorado Plaintiffs") acquired their Fraudulent Vehicles while in the State of Colorado.   As such, they bring the following causes of action against all defendants.

### COLORADO COUNT 1- FRAUD
### (On behalf of the Colorado Plaintiffs)

363.     The Colorado Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

364.     As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Colorado Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the

72

Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

365.    The Audi Gasoline Defendants valued their profits over the trust that the Colorado Plaintiffs entrusted to them. The Colorado Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

366.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Colorado Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

367.    Defendants' false representations and omissions were material to the Colorado Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Colorado Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

368.    The Colorado Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Colorado Plaintiffs had no way of discerning

that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Colorado Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

369.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Colorado Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Colorado Plaintiffs.

370.    Defendants had a duty to disclose the Cheat Device to the Colorado Plaintiffs.

371.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Colorado Plaintiffs, did not know about (and could not reasonably discover) its scheme.

372.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Colorado Plaintiffs.

373.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

374.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Colorado Plaintiffs.

375.    The Colorado Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

376.    The Colorado Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Colorado Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

377.    As a direct and proximate result of Defendants' fraudulent scheme, the Colorado Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions

standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

378.    The Colorado Plaintiffs hereby sue Defendants for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial.  Defendants engaged in willful and wanton conduct, that is, conduct purposefully committed which Volkswagen must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the Colorado Plaintiffs. Defendants' conduct thus warrants substantial exemplary damages in an amount to be determined at trial, for which the Colorado Plaintiffs sue Defendants.

**COLORADO COUNT 2-**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(Col. Rev. Stat. § 6-1-101, *et seq.*)**
**(On behalf of the Colorado Plaintiffs)**

379.    The Colorado Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

380.    The Colorado Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

381.    Defendants are "person[s]" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, et seq.

382.    The Colorado Plaintiffs are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased or leased one or more Fraudulent Vehicles.

383.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Volkswagen engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits

76

of the Fraudulent Vehicles that had the capacity or tendency to deceive the Colorado Plaintiffs; (2) representing that the Fraudulent Vehicles are of a particular standard, quality, and grade even though Volkswagen knew or should have known they are not; (3) advertising the Fraudulent Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Fraudulent Vehicles that was known to Volkswagen at the time of advertisement or sale with the intent to induce the Colorado Plaintiffs to purchase, lease or retain the Fraudulent Vehicles. *See* Colo. Rev. Stat. § 6-105(1)(e), (g), (i), (u).

384. In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Colorado Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

385. Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Colorado CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that

valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

386.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

387.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

388.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Colorado Plaintiffs.

389.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

390.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Colorado CPA.

391.    Defendants owed the Colorado Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.    intentionally concealed the foregoing from the Colorado Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Colorado Plaintiffs that contradicted these representations.

392.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

393.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Colorado Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

394.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Colorado Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

395.    The Colorado Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Colorado Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed

79

and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Colorado Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

396.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Colorado CPA in the course of their business.

397.    Defendants' violations present a continuing risk to the Colorado Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

398.    Pursuant to Colo. Rev. Stat. § 6-1-113, the Colorado Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial plus discretionary trebling of such damage.  The Colorado Plaintiffs also sue Defendants for attorneys' fees and costs per Colo. Rev. Stat. § 6-1-113(1)(b) plus any other just and proper relief available under the Colorado CPA.).

## CONNECTICUT

399.    Plaintiffs Roger Battacharia, Lee Couture and Tom Goosmann (collectively, the "Connecticut Plaintiffs") acquired their Fraudulent Vehicles while in the State of Connecticut.   As such, they bring the following causes of action against all defendants.

### CONNECTICUT COUNT 1- FRAUD
### (On behalf of the Connecticut Plaintiffs)

400.    The Connecticut Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

401.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Connecticut Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

402.    The Audi Gasoline Defendants valued their profits over the trust that the Connecticut Plaintiffs entrusted to them. The Connecticut Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

403.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Connecticut Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

404.    Defendants' false representations and omissions were material to the Connecticut Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Connecticut Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

405.    The Connecticut Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Connecticut Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Connecticut Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

406.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Connecticut Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Connecticut Plaintiffs.

407.    Defendants had a duty to disclose the Cheat Device to the Connecticut Plaintiffs.

408.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Connecticut Plaintiffs, did not know about (and could not reasonably discover) its scheme.

409.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the

quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Connecticut Plaintiffs.

410.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

411.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Connecticut Plaintiffs.

412.    The Connecticut Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

413.    The Connecticut Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the

driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Connecticut Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

414.    As a direct and proximate result of Defendants' fraudulent scheme, the Connecticut Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

415.    Defendants are liable to the Connecticut Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, and the Connecticut Plaintiffs hereby sue for such damages. Defendants engaged in wanton and malicious misconduct. Defendants' conduct thus warrants substantial exemplary damages in an amount to be determined at trial, for which the Connecticut Plaintiffs hereby sue.

## CONNECTICUT COUNT 2-
## VIOLATIONS OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### (Conn. Gen. Stat. § 42-110A, et seq.)
### (On behalf of the Connecticut Plaintiffs)

416.    The Connecticut Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

417.    The Connecticut Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

418.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

419.    Defendants are "person[s]" within the meaning of Conn. Gen. Stat. § 42-110a(3).

420.    Defendants are in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

421.    Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein.

422.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Connecticut Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

423.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Connecticut UTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that

valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

424.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

425.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

426.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Connecticut Plaintiffs.

427.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

428.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Connecticut UTPA.

429.    Defendants owed the Connecticut Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Connecticut Plaintiffs; and/or

   c. made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Connecticut Plaintiffs that contradicted these representations.

  430. Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

  431. Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Connecticut Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

  432. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Connecticut Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

  433. The Connecticut Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Connecticut Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been

disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Connecticut Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

434.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Connecticut UTPA in the course of their business.

435.    Defendants' violations present a continuing risk to the Connecticut Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

436.    The Connecticut Plaintiffs are entitled to recover, and hereby sue Defendants for, their actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g. Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

## **WASHINGTON DC**

437.    Plaintiff Karen Christian, (the "Washington DC Plaintiff") acquired her Fraudulent Vehicle while in the State of Washington DC.   As such, she brings the following causes of action against all defendants.

### **WASHTINGTON DC COUNT 1- FRAUD**
### **(On behalf of the Washington DC Plaintiff)**

438.    The Washington DC Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

439.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Washington DC Plaintiff about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

440.    The Audi Gasoline Defendants valued their profits over the trust that the Washington DC Plaintiff entrusted to them. The Washington DC Plaintiff acquired his car from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

441.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Washington DC Plaintiff.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

442.    Defendants' false representations and omissions were material to the Washington DC Plaintiff, as they concerned both the legality and core marketing features of the Fraudulent

Vehicles. As Defendants well knew, the Washington DC Plaintiff highly valued that the vehicle he was acquiring was high performance, fuel efficient, and had low emissions, and he paid a premium accordingly.

443.    The Washington DC Plaintiff reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Washington DC Plaintiff had no way of discerning that Defendants were, in fact, deceiving him because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Washington DC Plaintiff did not, and could not, unravel Defendants' scheme on his own.

444.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Washington DC Plaintiff and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Washington DC Plaintiff.

445.    Defendants had a duty to disclose the Cheat Device to the Washington DC Plaintiff.

446.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Washington DC Plaintiff, did not know about (and could not reasonably discover) its scheme.

447.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so

through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Washington DC Plaintiff.

448.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

449.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Washington DC Plaintiff.

450.    The Washington DC Plaintiff reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring his Fraudulent Vehicle.

451.    The Washington DC Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and he would not have acted as he did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs

or EOs for the sale of the Fraudulent Vehicles and as a consequence the Washington DC Plaintiff would never have acquired the Fraudulent Vehicle in the first place.

452.    As a direct and proximate result of Defendants' fraudulent scheme, the Washington DC Plaintiff sustained damages. He acquired a Fraudulent Vehicle that is non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicle either cannot be repaired to comply with applicable emissions standards, or if it can be made compliant, its performance, fuel efficiency, and longevity will be compromised.

453.    Defendants are liable to the Washington DC Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Washington DC Plaintiff hereby sues Defendants.  Defendants acted in a manner that was an extreme deviation from reasonable standards of conduct, and the acts were performed with an understanding of or disregard for their likely consequences.  Defendants acted with knowledge, intent, malice, oppression, fraud, gross negligence, wantonness, willfulness and deliberation.  Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Washington DC Plaintiff hereby sues Defendants.

## WASHINGTON DC COUNT 2-
## VIOLATIONS OF THE CONSUMER PROTECTION PROCEDURES ACT
### (D.C. Code § 28-3901, et seq.)
### (On behalf of the Washington DC Plaintiff)

454.    The Washington DC Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

455.    The Washington DC Plaintiff has complied with all applicable, pre-suit notice letter provisions, if any.

92

456.    Defendants are "person[s]" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. Code § 28-3901(a)(1).

457.    The Washington DC Plaintiff is a "consumer," as defined by D.C. Code § 28-3901(1)(2).

458.    Defendants' actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.    Volkswagen participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA.  By willfully failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, Volkswagen engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. Code § 28-3901, et seq., including: (1) representing that the Fraudulent Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Fraudulent Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Fraudulent Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Fraudulent Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

459.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions

93

testing by way of deliberately induced false readings. The Washington DC Plaintiff had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

460.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the District of Columbia CPPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

461.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

462.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

463.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Washington DC Plaintiff.

464.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

465.    The Audi Gasoline Defendants knew or should have known that their conduct violated the District of Columbia CPPA.

466.    Defendants owed the Washington DC Plaintiff a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Washington DC Plaintiff; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Washington DC Plaintiff that contradicted these representations.

467.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

468.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Washington DC Plaintiff. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

469.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Washington DC Plaintiff, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

470.    The Washington DC Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Washington DC Plaintiff would not have the Fraudulent Vehicle at all and/or—if the Fraudulent Vehicle's true nature had been disclosed and mitigated, and the Fraudulent Vehicle rendered legal to sell—would have paid significantly less for it. The Washington DC Plaintiff also suffered diminished value of his vehicle, as well as lost or diminished use.

471.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the District of Columbia CPPA in the course of their business.

472.    Defendants' violations present a continuing risk to the Washington DC Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

473.    Pursuant to the District of Columbia CPPA, the Washington DC Plaintiff sues for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. The Washington DC Plaintiff further sues for treble damages

or $1,500, whichever is greater, and punitive damages. The Washington DC Plaintiff seeks punitive damages against Defendants because their conduct evidences malice and/or egregious conduct. The Washington DC Plaintiff further sues for attorneys' fees and costs plus any other just and proper relief available under the District of Columbia CPPA

## DELAWARE

474.    Plaintiff Gerald Cole, (the "Delaware Plaintiff") acquired his Fraudulent Vehicle while in the State of Delaware.  As such, he brings the following causes of action against all defendants.

### DELAWARE COUNT 1- FRAUD
### (On behalf of the Delaware Plaintiff)

475.    The Delaware Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

476.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Delaware Plaintiff about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

477.    The Audi Gasoline Defendants valued their profits over the trust that the Delaware Plaintiff entrusted to them. The Delaware Plaintiff acquired his car from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

478.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Delaware Plaintiff.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

479.    Defendants' false representations and omissions were material to the Delaware Plaintiff, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Delaware Plaintiff highly valued that the vehicle he was acquiring was high performance, fuel efficient, and had low emissions, and he paid a premium accordingly.

480.    The Delaware Plaintiff reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Delaware Plaintiff had no way of discerning that Defendants were, in fact, deceiving him because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Delaware Plaintiff did not, and could not, unravel Defendants' scheme on his own.

481.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Delaware Plaintiff and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high

98

performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Delaware Plaintiff.

482.    Defendants had a duty to disclose the Cheat Device to the Delaware Plaintiff.

483.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Delaware Plaintiff, did not know about (and could not reasonably discover) its scheme.

484.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Delaware Plaintiff.

485.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

486.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Delaware Plaintiff.

487.    The Delaware Plaintiff reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring his Fraudulent Vehicle.

488.    The Delaware Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and he would not have acted as he did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Delaware Plaintiff would never have acquired the Fraudulent Vehicle in the first place.

489.    As a direct and proximate result of Defendants' fraudulent scheme, the Delaware Plaintiff sustained damages. He acquired a Fraudulent Vehicle that is non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicle either cannot be repaired to comply with applicable emissions standards, or if it can be made compliant, its performance, fuel efficiency, and longevity will be compromised.

490.    Defendants are liable to the Delaware Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Delaware Plaintiff hereby sues Defendants. Defendants acted in a manner that was an extreme deviation from reasonable standards of conduct, and the acts were performed with

an understanding of or disregard for their likely consequences. Defendants acted with knowledge, intent, malice, oppression, fraud, gross negligence, wantonness, willfulness and deliberation. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Delaware Plaintiff hereby sues Defendants.

**DELAWARE COUNT 2-**
**VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT**
**(6 Del. Code § 2513, et seq.)**
**(On behalf of the Delaware Plaintiff)**

491.     The Delaware Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

492.     The Delaware Plaintiff has complied with all applicable, pre-suit notice letter Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

493.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

494.     In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions

101

testing by way of deliberately induced false readings. The Delaware Plaintiff had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

495.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Delaware CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

496.     The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

497.     The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

498.     The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Delaware Plaintiff.

499.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

500.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Delaware CFA.

501.    Defendants owed the Delaware Plaintiff a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Delaware Plaintiff; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Delaware Plaintiff that contradicted these representations.

502.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

503.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Delaware Plaintiff.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

103

504.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Delaware Plaintiff, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

505.    The Delaware Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Delaware Plaintiff would not have the Fraudulent Vehicle at all and/or—if the Fraudulent Vehicle's true nature had been disclosed and mitigated, and the Fraudulent Vehicle rendered legal to sell—would have paid significantly less for it. The Delaware Plaintiff also suffered diminished value of his vehicle, as well as lost or diminished use.

506.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Delaware CFA in the course of their business.

507.    Defendants' violations present a continuing risk to the Delaware Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

508.    The Delaware Plaintiff sues for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g., Stephenson v. Capano Dev.*, Inc., 462 A.2d 1069, 1077 (Del. 1983). The

Delaware Plaintiff further sues Defendants for attorneys' fees and costs plus any other just and proper relief available under the Delaware CFA. The Delaware Plaintiff further sues Defendants for punitive damages because they engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## FLORIDA

509.    Plaintiffs Scott Berger, Harriet Berger, Michael Borgailo, Richard Brilhante, Jimmy Clark, Rachel Cody, Graham Franklin, Michael Franklin, Matt Ganovsky, Karen Ganovsky, Adam Jackson, Arthur Jacoby, Melissa Kukk, Andrew Ladores, Dean Newhard, Ramon Ozambela, Paul Rathert, Danielle Rathert, Aurelio Reyes, Eric Schilling, Joel Uptmor, Scott Weinberg, William Willoughby, Margaret Willoughby, Lyndon Wilson, and Margaret Dean (collectively, the "Florida Plaintiffs") acquired their Fraudulent Vehicles while in the State of Florida. As such, they bring the following causes of action against all defendants.

### FLORIDA COUNT 1- FRAUD
### (On behalf of the Florida Plaintiffs)

510.    The Florida Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

511.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Florida Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and

represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

512.    The Audi Gasoline Defendants valued their profits over the trust that the Florida Plaintiffs entrusted to them. The Florida Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

513.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Florida Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

514.    Defendants' false representations and omissions were material to the Florida Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Florida Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

515.    The Florida Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Florida Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Florida Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

516.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Florida Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Florida Plaintiffs.

517.    Defendants had a duty to disclose the Cheat Device to the Florida Plaintiffs.

518.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Florida Plaintiffs, did not know about (and could not reasonably discover) its scheme.

519.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Florida Plaintiffs.

520.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal

emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

521.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Florida Plaintiffs.

522.    The Florida Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

523.    The Florida Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Florida Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

524.    As a direct and proximate result of Defendants' fraudulent scheme, the Florida Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

525.    Defendants are liable to the Florida Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Florida Plaintiffs hereby sue. Defendants engaged in fraud in conduct with actual malice and deliberate oppression. Defendants engaged in intentional misconduct, that is, Defendants had actual knowledge of the wrongfulness of the conduct and there was a high probability of injury or damage to the Florida Plaintiffs and, despite that knowledge, Defendants intentionally pursued that course of conduct, resulting in injury or damage. Defendants also engaged in gross negligence, that is, conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. Defendants engaged in fraud, malice, oppression or such recklessness or negligence as evinces a conscious disregard of the rights of others. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Florida Plaintiffs hereby sue.

**FLORIDA COUNT 2-**
**VIOLATIONS OF FLORIDA'S UNFAIR &**
**DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, et seq.)**
**(On behalf of the Florida Plaintiffs)**

526.    The Florida Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

527.    The Florida Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any, including those of the Florida Unfair and Deceptive Trade Practices Act.

528.    The Florida Plaintiffs are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

529.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

530.     FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

531.     In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Florida Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

532.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Florida FUDTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

533.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

534.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

535.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Florida Plaintiffs.

536.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

537.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Florida FUDTPA.

538.    Defendants owed the Florida Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.      intentionally concealed the foregoing from the Florida Plaintiffs; and/or

c.      made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Florida Plaintiffs that contradicted these representations.

111

539.     Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

540.     Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Florida Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

541.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Florida Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

542.     The Florida Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Florida Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly

less for them. The Florida Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

543.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Florida FUDTPA in the course of their business.

544.    Defendants' violations present a continuing risk to the Florida Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

545.    The Florida Plaintiffs hereby sue Defendants to recover their actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) under Fla. Stat. § 501.211(2) plus attorneys' fees and costs under Fla. Stat. § 501.2105(1) plus any other just and proper relief under FUDTPA.

## KANSAS

546.    Plaintiff Kyle Graham (the "Kansas Plaintiff") acquired his Fraudulent Vehicle while in the State of Kansas.    As such, he brings the following causes of action against all defendants.

### KANSAS COUNT 1- FRAUD
### (On behalf of the Kansas Plaintiff)

547.    The Kansas Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

548.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Kansas Plaintiff about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by

113

installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

549.    The Audi Gasoline Defendants valued their profits over the trust that the Kansas Plaintiff entrusted to them. The Kansas Plaintiff bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

550.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Kansas Plaintiff. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

551.    Defendants' false representations and omissions were material to the Kansas Plaintiff, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Kansas Plaintiff highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

114

552.     The Kansas Plaintiff reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Kansas Plaintiff had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Kansas Plaintiff did not, and could not, unravel Defendants' scheme on his own.

553.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Kansas Plaintiff and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Kansas Plaintiff.

554.     Defendants had a duty to disclose the Cheat Device to the Kansas Plaintiff.

555.     The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Kansas Plaintiff, did not know about (and could not reasonably discover) its scheme.

556.     The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker,"

115

vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Kansas Plaintiff.

557.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

558.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Kansas Plaintiff.

559.    The Kansas Plaintiff reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

560.    The Kansas Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and he would not have acted as he did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Kansas Plaintiff would never have acquired the Fraudulent Vehicles in the first place.

561.    As a direct and proximate result of Defendants' fraudulent scheme, the Kansas Plaintiff sustained damages. They acquired Fraudulent Vehicles that are non-compliant and

severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

562.     Defendants are liable to the Kansas Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, and the Kansas Plaintiff hereby sues Defendants for such damages.  Defendant acted toward the Kansas Plaintiff with willful conduct, wanton conduct, fraud and malice.  Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Kansas Plaintiff hereby sues Defendants.

**KANSAS COUNT 2-**
**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**(Kan. Stat. Ann. § 50-623, et seq.)**
**(On behalf of the Kansas Plaintiff)**

563.     The Kansas Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

564.     The Kansas Plaintiff has complied with all applicable, pre-suit notice letter provisions, if any.

565.     Defendants are "suppliers" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

566.     The Kansas Plaintiff is a "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Fraudulent Vehicles.

567.     The sale of the Fraudulent Vehicles to the Kansas Plaintiff was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

568.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).  Defendants violated the aforementioned provisions of the Kansas CPA.

569.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Kansas Plaintiff had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

118

570.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Kansas CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

571.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

572.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

573.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Kansas Plaintiff.

574.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

575.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Kansas CPA.

576.     Defendants owed the Kansas Plaintiff a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.     intentionally concealed the foregoing from the Kansas Plaintiff; and/or

c.     made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Kansas Plaintiff that contradicted these representations.

577.     Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

578.     Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Kansas Plaintiff.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

579.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kansas Plaintiff, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

580.     The Kansas Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Kansas Plaintiff who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Kansas Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

581.     Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Kansas CPA in the course of their business.

582.     Defendants' violations present a continuing risk to the Kansas Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

583.     Pursuant to Kan. Stat. Ann. § 50-634, the Kansas Plaintiff sues for monetary relief against Defendants measured as the greater of (a) actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.  The Kansas Plaintiff further seeks punitive damages plus attorneys' fees and costs Kan. Stat. Ann. § 50-634(e) plus any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

## KENTUCKY

584.     Plaintiff Todd Creek (the "Kentucky Plaintiff") acquired his Fraudulent Vehicle while in the State of Kentucky.     As such, he brings the following causes of action against all defendants.

## KENTUCKY COUNT 1- FRAUD
### (On behalf of the Kentucky Plaintiff)

585.     The Kentucky Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

586.     As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Kentucky Plaintiff about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

587.     The Audi Gasoline Defendants valued their profits over the trust that the Kentucky Plaintiff entrusted to them. The Kentucky Plaintiff bought his car from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

588.     Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the

Kentucky Plaintiff. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

589.    Defendants' false representations and omissions were material to the Kentucky Plaintiff, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Kentucky Plaintiff highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

590.    The Kentucky Plaintiff reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Kentucky Plaintiff had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Kentucky Plaintiff did not, and could not, unravel Defendants' scheme on his own.

591.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Kentucky Plaintiff and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Kentucky Plaintiff.

592.    Defendants had a duty to disclose the Cheat Device to the Kentucky Plaintiff.

593.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Kentucky Plaintiff, did not know about (and could not reasonably discover) its scheme.

594.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Kentucky Plaintiff.

595.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

596.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Kentucky Plaintiff.

597.    The Kentucky Plaintiff reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

598.    The Kentucky Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and he would not have acted as he did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Kentucky Plaintiff would never have acquired the Fraudulent Vehicles in the first place.

599.    As a direct and proximate result of Defendants' fraudulent scheme, the Kentucky Plaintiff sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

600.    Defendants are liable to the Kentucky Plaintiff for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Kentucky Plaintiff hereby sues.  Defendants acted towards the Kentucky Plaintiff with fraud, oppression, and malice.  Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Kentucky Plaintiff hereby sues.

### KENTUCKY COUNT 2-
### VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT
### (Ky. Rev. Stat. § 367.110, et seq.)
### (On behalf of the Kentucky Plaintiff)

601.    The Kentucky Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

602.    The Kentucky Plaintiff has complied with all applicable, pre-suit notice letter provisions, if any.

603.    Defendants and the Kentucky Plaintiff are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

604.    Defendants engaged in "trade" or "commerce" within the meaning of Ky. Rev. 26 Stat. § 367.110(2).

605.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." Ky. Rev. Stat. § 367.170(1). Defendants participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the engine system, by marketing their vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting themselves as reputable manufacturers that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

606.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result

was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Kentucky Plaintiff had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

607.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Kentucky CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

608.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

609.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

610.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Kentucky Plaintiff.

611.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

612.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Kentucky CPA.

613.    Defendants owed the Kentucky Plaintiff a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Kentucky Plaintiff; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Kentucky Plaintiff that contradicted these representations.

614.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

615.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Kentucky Plaintiff.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

128

616.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Kentucky Plaintiff, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

617.    The Kentucky Plaintiff suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Kentucky Plaintiff who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Kentucky Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

618.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Kentucky CPA in the course of their business.

619.    Defendants' violations present a continuing risk to the Kentucky Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

620.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, the Kentucky Plaintiff sues Defendants to recover actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional

distress) plus punitive damages plus attorneys' fees and costs per Ky. Rev. Stat. Ann. § 367.220(3)

plus any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**LOUISIANA**

621.    Plaintiffs Donald Clay, Jack Duffard, Mark Hodge and Robert Miller (collectively,

the "Louisiana Plaintiffs") acquired their Fraudulent Vehicles while in the State of Louisiana.   As

such, they bring the following causes of action against all defendants.

**LOUISIANA COUNT 1- FRAUD**
**(On behalf of the Louisiana Plaintiffs)**

622.    The Louisiana Plaintiffs incorporate by reference each preceding paragraph as

though fully set forth herein.

623.    As alleged extensively above, the Audi Gasoline Defendants intentionally

concealed and suppressed material facts concerning the illegality and quality of the Fraudulent

Vehicles in order to defraud and mislead the Louisiana Plaintiffs about the true nature of the

Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by

installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the

Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during

testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities

of noxious pollutants and contaminants and achieved less fuel economy that was advertised and

represented.  The result was precisely what the Audi Gasoline Defendants had intended—the

Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false

readings and thus successfully imported and sold and/or leased to unwitting American consumers.

624.    The Audi Gasoline Defendants valued their profits over the trust that the Louisiana

Plaintiffs entrusted to them. The Louisiana Plaintiffs bought their cars from the Audi Gasoline

130

Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

625.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Louisiana Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

626.    Defendants' false representations and omissions were material to the Louisiana Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Louisiana Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

627.    The Louisiana Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Louisiana Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Louisiana Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

628.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Louisiana Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Louisiana Plaintiffs.

629.    Defendants had a duty to disclose the Cheat Device to the Louisiana Plaintiffs.

630.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Louisiana Plaintiffs, did not know about (and could not reasonably discover) its scheme.

631.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Louisiana Plaintiffs.

632.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

633.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Louisiana Plaintiffs.

634.    The Louisiana Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

635.    The Louisiana Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Louisiana Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

636.    As a direct and proximate result of Defendants' fraudulent scheme, the Louisiana Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

637.    Defendants are liable to the Louisiana Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Louisiana Plaintiffs hereby sue. Defendants' conduct was wanton and reckless, such conduct threatened the public safety, and the Louisiana Plaintiffs' injuries were caused by such wanton and reckless conduct. Defendants' conduct thus warrants the award of substantial

punitive damages in an amount to be determined at trial, for which the Louisiana Plaintiffs hereby sue.

**LOUISIANA COUNT 2-**
**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(La. Rev. Stat. § 51:1401, et seq.)**
**(On behalf of the Louisiana Plaintiffs)**

638.    The Louisiana Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

639.    The Louisiana Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

640.    Defendants and the Louisiana Plaintiffs are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

641.    The Louisiana Plaintiffs are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

642.    Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

643.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

644.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy

134

test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Louisiana Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

645.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Louisiana CPL by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

646.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

647.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

648.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Louisiana Plaintiffs.

649.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

650.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Louisiana CPL.

651.    Defendants owed the Louisiana Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.    intentionally concealed the foregoing from the Louisiana Plaintiffs; and/or

   c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Louisiana Plaintiffs that contradicted these representations.

652.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

653.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Louisiana Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

136

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

654.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Louisiana Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

655.    The Louisiana Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Louisiana Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Louisiana Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

656.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Louisiana CPL in the course of their business.

657.    Defendants' violations present a continuing risk to the Louisiana Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

658.    Pursuant to La. Rev. Stat. § 51:1409, the Louisiana Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation,

damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial plus treble damages for Defendants' knowing violations of the Louisiana CPL plus attorneys' fees and costs per La. Rev. Stat. § 51:1409(a) plus any other just and proper relief available under La. Rev. Stat. § 51:1409.

## MINNESOTA

659.    Plaintiffs Sean Muniz and David Sloane (collectively, the "Minnesota Plaintiffs") acquired their Fraudulent Vehicles while in the State of Minnesota.    As such, they bring the following causes of action against all defendants.

## MINNESOTA COUNT 1- FRAUD
### (On behalf of the Minnesota Plaintiffs)

660.    The Minnesota Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

661.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Minnesota Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

662.    The Audi Gasoline Defendants valued their profits over the trust that the Minnesota Plaintiffs entrusted to them. The Minnesota Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

663.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Minnesota Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

664.    Defendants' false representations and omissions were material to the Minnesota Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Minnesota Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

665.    The Minnesota Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Minnesota Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Minnesota Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

666.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Minnesota Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high

performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Minnesota Plaintiffs.

667.    Defendants had a duty to disclose the Cheat Device to the Minnesota Plaintiffs.

668.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Minnesota Plaintiffs, did not know about (and could not reasonably discover) its scheme.

669.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Minnesota Plaintiffs.

670.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

671.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Minnesota Plaintiffs.

672.    The Minnesota Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

673.    The Minnesota Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Minnesota Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

674.    As a direct and proximate result of Defendants' fraudulent scheme, the Minnesota Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

675.    Defendants are liable to the Minnesota Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Minnesota Plaintiffs hereby sue. Defendants' acted with deliberate disregard

for the rights or safety of others. Defendants knew about facts or intentionally ignored facts that created a high probability of injury to the rights or safety of others, and deliberately acted with conscious or intentional disregard or with indifference to the high probability of injury to the rights or safety of others. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Minnesota Plaintiffs hereby sue.

**MINNESOTA COUNT 2-**
**VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(Minn. Stat. § 325f.68, et seq.)**
**(On behalf of the Minnesota Plaintiffs)**

676.    The Minnesota Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

677.    The Minnesota Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

678.    The Fraudulent Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

679.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1). Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.

680.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in

142

the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Minnesota Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

681.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Minnesota CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

682.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

683.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

684.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Minnesota Plaintiffs.

685.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

686.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Minnesota CFA.

687.    Defendants owed the Minnesota Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.    intentionally concealed the foregoing from the Minnesota Plaintiffs; and/or

   c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Minnesota Plaintiffs that contradicted these representations.

688.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

689.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Minnesota Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that concedes its polluting engines rather than promptly remedying them.

690.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Minnesota Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

691.    The Minnesota Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Minnesota Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Minnesota Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

692.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Minnesota CFA in the course of their business.

693.    Defendants' violations present a continuing risk to the Minnesota Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

694.    Pursuant to Minn. Stat. § 8.31(3a), the Minnesota Plaintiffs seek and hereby sue Defendants for actual damages, including economic and non-economic damages (including,

without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus costs of investigation, attorneys' fees, and court costs per Minn. Stat. § 8.31(3a) plus any other just and proper relief available under the Minnesota CFA. The Minnesota Plaintiffs further seek and hereby sue Defendants for punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

### MISSISSIPPI

695.    Plaintiffs Keira Bobo, Shelia Powell, and Blane Mire (collectively, the "Mississippi Plaintiffs") acquired their Fraudulent Vehicles while in the State of Mississippi.   As such, they bring the following causes of action against all defendants.

### MISSISSIPPI COUNT 1- FRAUD
### (On behalf of the Mississippi Plaintiffs)

696.    The Mississippi Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

697.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Mississippi Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the

146

Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

698.    The Audi Gasoline Defendants valued their profits over the trust that the Mississippi Plaintiffs entrusted to them. The Mississippi Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

699.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Mississippi Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

700.    Defendants' false representations and omissions were material to the Mississippi Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Mississippi Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

701.    The Mississippi Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Mississippi Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Mississippi Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

702.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Mississippi Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Mississippi Plaintiffs.

703.    Defendants had a duty to disclose the Cheat Device to the Mississippi Plaintiffs.

704.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Mississippi Plaintiffs, did not know about (and could not reasonably discover) its scheme.

705.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Mississippi Plaintiffs.

706.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal

148

emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

707.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Mississippi Plaintiffs.

708.    The Mississippi Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

709.    The Mississippi Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Mississippi Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

710.    As a direct and proximate result of Defendants' fraudulent scheme, the Mississippi Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

711.    Defendants are liable to the Mississippi Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Mississippi Plaintiffs hereby sue. Defendants' acted with malice, gross negligence, and with reckless disregard for the rights of others. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Mississippi Plaintiffs hereby sue.

## NEVADA

712.    Plaintiffs Kenneth Caldwell, Jacqueline Davis, Edward Hanson, Pamela Hertz, Catherine Hyde, Alan Mintz, Judie Mintz, Scott Nielson, Andrew Oh, Derrick Penney, Sheldon Rayman, Thomas Tait, and Katherine Tait (collectively, the "Nevada Plaintiffs") acquired their Fraudulent Vehicles while in the State of Nevada. As such, they bring the following causes of action against all defendants.

## NEVADA COUNT 1- FRAUD
### (On behalf of the Nevada Plaintiffs)

713.    The Nevada Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

714.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Nevada Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities

150

of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

715. The Audi Gasoline Defendants valued their profits over the trust that the Nevada Plaintiffs entrusted to them. The Nevada Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

716. Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Nevada Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

717. Defendants' false representations and omissions were material to the Nevada Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Nevada Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

718. The Nevada Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Nevada Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology

and could not be discerned by regulators, much less consumers. The Nevada Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

719.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Nevada Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Nevada Plaintiffs.

720.    Defendants had a duty to disclose the Cheat Device to the Nevada Plaintiffs.

721.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Nevada Plaintiffs, did not know about (and could not reasonably discover) its scheme.

722.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Nevada Plaintiffs.

723.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

724.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Nevada Plaintiffs.

725.    The Nevada Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

726.    The Nevada Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Nevada Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

727.    As a direct and proximate result of Defendants' fraudulent scheme, the Nevada Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions

standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

728.    Defendants are liable to the Nevada Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Nevada Plaintiffs sue Defendants.  Defendants are guilty of oppression, fraud and malice, express or implied.  Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the Nevada Plaintiffs sue Defendants.

**NEVADA COUNT 2-**
**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq.*)**
**(On behalf of the Nevada Plaintiffs)**

729.    The Nevada Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

730.    The Nevada Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

731.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, et seq. prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another

154

standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction." Defendants violated the aforementioned provisions of the Nevada DTPA.

732. In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Nevada Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

733. Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Nevada DTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

734. The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high

quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

735.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

736.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Nevada Plaintiffs.

737.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

738.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Nevada DTPA.

739.    Defendants owed the Nevada Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Nevada Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Nevada Plaintiffs that contradicted these representations.

740.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once

Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

741.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Nevada Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

742.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Nevada Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

743.    The Nevada Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Nevada Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Nevada Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

744.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Nevada DTPA in the course of their business.

745.    Defendants' violations present a continuing risk to the Nevada Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

746.    Accordingly, the Nevada Plaintiffs seek, and hereby sue Defendants for, their actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus costs of Court and attorney's fees plus all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  Nev. Rev. Stat. § 41.600.

## NEW HAMPSHIRE

747.    Plaintiffs Stephanie Basile, Ryan Gisetto and Monica Gisetto (collectively, the "New Hampshire Plaintiffs") acquired their Fraudulent Vehicles while in the State of New Hampshire.   As such, they bring the following causes of action against all defendants.

### NEW HAMPSHIRE COUNT 1- FRAUD
### (On behalf of the New Hampshire Plaintiffs)

748.    The New Hampshire Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

749.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the New Hampshire Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during

158

testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

750.    The Audi Gasoline Defendants valued their profits over the trust that the New Hampshire Plaintiffs entrusted to them. The New Hampshire Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

751.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the New Hampshire Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

752.    Defendants' false representations and omissions were material to the New Hampshire Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the New Hampshire Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

753.    The New Hampshire Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The New Hampshire Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely

sophisticated technology and could not be discerned by regulators, much less consumers. The New Hampshire Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

754.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the New Hampshire Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the New Hampshire Plaintiffs.

755.    Defendants had a duty to disclose the Cheat Device to the New Hampshire Plaintiffs.

756.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the New Hampshire Plaintiffs, did not know about (and could not reasonably discover) its scheme.

757.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the New Hampshire Plaintiffs.

758.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

759.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the New Hampshire Plaintiffs.

760.    The New Hampshire Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

761.    The New Hampshire Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the New Hampshire Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

762.    As a direct and proximate result of Defendants' fraudulent scheme, the New Hampshire Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable

emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

763.    Defendants are liable to the New Hampshire Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the New Hampshire Plaintiffs sue Defendants. Defendants' conduct was wanton, malicious, or oppressive. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which the New Hampshire Plaintiffs sue Defendants.

**NEW HAMPSHIRE COUNT 2-**
**VIOLATIONS OF N.H. CONSUMER PROTECTION ACT**
**(N.H. Rev. Stat. Ann. § 358-a:1, et seq.)**
**(On behalf of the New Hampshire Plaintiffs)**

764.    The New Hampshire Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

765.    The New Hampshire Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

766.    The New Hampshire Plaintiffs and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

767.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

768.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular

162

standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2. Defendants intentionally violated the New Hampshire CPA.

769.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The New Hampshire Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

770.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the New Hampshire CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

771.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high

quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

772.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

773.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New Hampshire Plaintiffs.

774.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

775.    The Audi Gasoline Defendants knew or should have known that their conduct violated the New Hampshire CPA.

776.    Defendants owed the New Hampshire Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the New Hampshire Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the New Hampshire Plaintiffs that contradicted these representations.

164

777.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

778.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the New Hampshire Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

779.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New Hampshire Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

780.    The New Hampshire Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The New Hampshire Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid

significantly less for them. The New Hampshire Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

781.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the New Hampshire CPA in the course of their business.

782.    Defendants' violations present a continuing risk to the New Hampshire Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

783.    Because Defendants' willful conduct caused injury to the New Hampshire Plaintiffs' property through violations of the New Hampshire CPA, the New Hampshire Plaintiffs hereby sue Defendants for recovery of actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages plus court costs  reasonable attorneys' fees per N.H. REV. STAT. § 358-A:10 and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## NEW JERSEY

784.    Plaintiffs Michael Assile, Ashraful Aziz, Jeff Basile, Nathalie Basile, Steve Borne, Howard Bregman, Andre Brooks, Stuart Cassel, Peter Chang, Rajni Choksi, Suzanne Dill, Paul Dinice, Theodore Fredericks,Frank Galzarano, Jonathan Katz, Peter Kowalchuk, Keith Lerner, Mikael Levey, Jessica Levey, Douglas Marquez, Peter Martorano, Robert Northfield, Linda Novelli, Fahrudin (Frank) Omerovic, Dawn Pagano, Ross Pagano, Thomas Petrelli, Kathleen Petrelli, Renier Pierantoni, Lisa Campisi, Aftab Punjwani, Robert Ritter, Mathew Rulnick, Tony Shabo, Ilan Shemtov, Christopher Shin, Duke Shin, Stephanie Smith, Barry Stangel, Michael Testa, Guido Urzua, Jessica Urzua, Kevin Vo, William Wallner, Thomas White, Ronald Wilson,

Raymond Woods, and Jose Zimmerman (collectively, the "New Jersey Plaintiffs") acquired their Fraudulent Vehicles while in the State of New Jersey.   As such, they bring the following causes of action against all defendants.

## NEW JERSEY COUNT 1- FRAUD
### (On behalf of the New Jersey Plaintiffs)

785.    The New Jersey Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

786.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the New Jersey Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

787.    The Audi Gasoline Defendants valued their profits over the trust that the New Jersey Plaintiffs entrusted to them. The New Jersey Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

788.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the New

Jersey Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

789.     Defendants' false representations and omissions were material to the New Jersey Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the New Jersey Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

790.     The New Jersey Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The New Jersey Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The New Jersey Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

791.     Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the New Jersey Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the New Jersey Plaintiffs.

792.     Defendants had a duty to disclose the Cheat Device to the New Jersey Plaintiffs.

793.     The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the New Jersey Plaintiffs, did not know about (and could not reasonably discover) its scheme.

794.     The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the New Jersey Plaintiffs.

795.     Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

796.     The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the New Jersey Plaintiffs.

797.    The New Jersey Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

798.    The New Jersey Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the New Jersey Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

799.    As a direct and proximate result of Defendants' fraudulent scheme, the New Jersey Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

800.    Defendants are liable to the New Jersey Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the New Jersey Plaintiffs sue Defendants.    Defendants engaged in intentional, willful and wanton wrongdoing with recklessness in disregard of what might happen to someone. Defendants' conduct thus warrants substantial exemplary damages in an amount to be determined at trial, for which the New Jersey Plaintiffs sue Defendants.

### NEW JERSEY COUNT 2-
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. §§ 56:8-1, et seq.)

801.    The New Jersey Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

802.    The New Jersey Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

803.    The New Jersey Plaintiffs and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

804.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

805.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2. Defendants intentionally violated the New Jersey CFA.

806.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would

emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The New Jersey Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

807.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the New Jersey CFA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

808.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

809.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

810.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New Jersey Plaintiffs.

811.   Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

812.   The Audi Gasoline Defendants knew or should have known that their conduct violated the New Jersey CFA.

813.   Defendants owed the New Jersey Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from the New Jersey Plaintiffs; and/or

c.   made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the New Jersey Plaintiffs that contradicted these representations.

814.   Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

815.   Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the New Jersey Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

173

816.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New Jersey Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

817.    The New Jersey Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The New Jersey Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The New Jersey Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

818.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the New Jersey CFA in the course of their business.

819.    Defendants' violations present a continuing risk to the New Jersey Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

820.    As a result of the foregoing wrongful conduct of Defendants, the New Jersey Plaintiffs have been damaged in an amount to be proven at trial, and hereby sue Defendants for all just and proper remedies, including, but not limited to, actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation,

inconvenience, mental anguish and emotional distress) plus statutory damages plus treble damages plus punitive damages plus costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19 plus all other just and appropriate relief under the New Jersey CFA.

## NEW MEXICO

821.    Plaintiffs Brent Armstrong, Rachel Armstrong and Todd Graves (collectively, the "New Mexico Plaintiffs") acquired their Fraudulent Vehicles while in the State of New Mexico. As such, they bring the following causes of action against all defendants.

### NEW MEXICO COUNT 1- FRAUD
### (On behalf of the New Mexico Plaintiffs)

822.    The New Mexico Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

823.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the New Mexico Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

824.    The Audi Gasoline Defendants valued their profits over the trust that the New Mexico Plaintiffs entrusted to them. The New Mexico Plaintiffs bought their cars from the Audi

Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

825.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the New Mexico Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

826.    Defendants' false representations and omissions were material to the New Mexico Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the New Mexico Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

827.    The New Mexico Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The New Mexico Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The New Mexico Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

828.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the New Mexico Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the New Mexico Plaintiffs.

829.    Defendants had a duty to disclose the Cheat Device to the New Mexico Plaintiffs.

830.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the New Mexico Plaintiffs, did not know about (and could not reasonably discover) its scheme.

831.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the New Mexico Plaintiffs.

832.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

833.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits

and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the New Mexico Plaintiffs.

834. The New Mexico Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

835. The New Mexico Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the New Mexico Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

836. As a direct and proximate result of Defendants' fraudulent scheme, the New Mexico Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

837. Defendants are liable to the New Mexico Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the New Mexico Plaintiffs sue Defendants.    Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which

the New Mexico Plaintiffs sue Defendants.

**NEW MEXICO COUNT 2-**
**VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1, et seq.)**
**(On behalf of the New Mexico Plaintiffs)**

838.    The New Mexico Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

839.    The New Mexico Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

840.    Defendants and the New Mexico Plaintiffs are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

841.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

842.    The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D). Defendants' acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D). In addition, Defendants' actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of the Plaintiffs to a grossly unfair degree.

843.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by

179

Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The New Mexico Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

844.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the New Mexico UTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

845.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

846.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the

law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

847.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New Mexico Plaintiffs.

848.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

849.    The Audi Gasoline Defendants knew or should have known that their conduct violated the New Mexico UTPA.

850.    Defendants owed the New Mexico Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.    intentionally concealed the foregoing from the New Mexico Plaintiffs; and/or

   c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the New Mexico Plaintiffs that contradicted these representations.

851.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

852.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the New Mexico Plaintiffs. A vehicle made

181

by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

853.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New Mexico Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

854.    The New Mexico Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The New Mexico Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The New Mexico Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

855.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the New Mexico UTPA in the course of their business.

856.    Defendants' violations present a continuing risk to the New Mexico Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

857.    Because Defendants' unconscionable, willful conduct caused actual harm to the New Mexico Plaintiffs, the New Mexico Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus discretionary treble damages plus punitive damages plus reasonable attorneys' fees and costs per N.M. STAT. ANN. § 57-12-10(c) plus all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## NEW YORK

858.    Plaintiffs Morris Edelstein, Raynard Gagnon, Jeffrey Gartner, Thaddeus Kuzniarek, Julie Mulligan, John Pecoraro, Paul Saby, and Edgar Romano (collectively, the "New York Plaintiffs") acquired their Fraudulent Vehicles while in the State of New York.   As such, they bring the following causes of action against all defendants.

### NEW YORK COUNT 1- FRAUD
### (On behalf of the New York Plaintiffs)

859.    The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

860.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the New York Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and

183

represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

861.    The Audi Gasoline Defendants valued their profits over the trust that the New York Plaintiffs entrusted to them. The New York Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

862.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the New York Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

863.    Defendants' false representations and omissions were material to the New York Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the New York Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

864.    The New York Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The New York Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The New York Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

865.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the New York Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the New York Plaintiffs.

866.    Defendants had a duty to disclose the Cheat Device to the New York Plaintiffs.

867.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the New York Plaintiffs, did not know about (and could not reasonably discover) its scheme.

868.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the New York Plaintiffs.

869.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal

emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

870.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the New York Plaintiffs.

871.    The New York Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

872.    The New York Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the New York Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

873.    As a direct and proximate result of Defendants' fraudulent scheme, the New York Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

874.    Defendants are liable to the New York Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the New York Plaintiffs sue Defendants. Defendants' conduct was highly morally culpable, gross, wanton, and willful and so reprehensible as to warrant the imposition of punitive damages. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the New York Plaintiffs sue Defendants.

### NEW YORK COUNT 2-
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. Gen. Bus. Law § 349)
### (On behalf of the New York Plaintiffs)

875.    The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

876.    The New York Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

877.    The New York Plaintiffs and Defendants are "persons" under N.Y. Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA").

878.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

879.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

880.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in

187

the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The New York Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

881.     Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the New York DAPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

882.     The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

883.     The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

188

884.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New York Plaintiffs.

885.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

886.    The Audi Gasoline Defendants knew or should have known that their conduct violated the New York DAPA.

887.    Defendants owed the New York Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the New York Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the New York Plaintiffs that contradicted these representations.

888.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

889.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the New York Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

189

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

890.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the New York Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

891.    The New York Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The New York Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The New York Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

892.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the New York DAPA in the course of their business.

893.    Defendants' violations present a continuing risk to the New York Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

894.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, the New York Plaintiffs have been damaged in an amount to be proven at trial, and hereby sue

Defendants for all just and proper remedies, including but not limited to actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages up to $1,000 plus punitive damages plus reasonable attorneys' fees and costs per N.Y. Gen. Bus. Law § 349(h) plus all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT 3-**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**
**(On behalf of the New York Plaintiffs)**

895.    The New York Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

896.    The New York Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

897.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

898.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of …representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a. Defendants caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Defendants, or that through the exercise of reasonable care should have been known by Defendants, to be untrue and misleading to the New York Plaintiffs.

191

899.     Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Fraudulent Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on the Fraudulent Vehicles. Specifically, Defendants intentionally concealed and suppressed material facts concerning the legality and quality of the Fraudulent Vehicles in order to intentionally and grossly defraud and mislead the New York Plaintiffs concerning the true emissions produced by the Fraudulent Vehicles.

900.     The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer. Specifically, although Defendants advertised the Fraudulent Vehicles as clean and environmentally-friendly, they in fact used a sophisticated defeat device that was undetectable to the ordinary consumer that made them non-compliant with EPA emission regulations.   Defendants further falsely misrepresented the fuel economy and performance of the Fraudulent Vehicles.

901.     Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the New York Plaintiffs.

902.     Defendants' false advertising was likely to and did in fact deceive regulators and reasonable consumers, including the New York Plaintiffs, about the illegality and true characteristics of the Fraudulent Vehicles, the quality of the Defendants' brands and the true value of the Fraudulent Vehicles.

903.     Defendants' violations of the NY FAA present a continuing risk to the New York Plaintiffs and to the general public. Defendants' deceptive acts and practices affect the public interest.

904.    The Fraudulent Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

905.    The New York Plaintiffs who purchased Fraudulent Vehicles either would not have purchased them at all or paid less but for Defendants' false advertising in violation of the NY FAA. The New York Plaintiffs who leased Fraudulent Vehicles either would not have leased them at all, or at a lower rate but for Defendants' false advertising in violation of the NY FAA.

906.    The New York Plaintiffs have suffered injury-in-fact and/or actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) and ascertainable loss as a direct and proximate result of the Defendants' false advertising in violation of the NY FAA, including but not limited to acquiring an illegal vehicle, diminished or complete lost value for the Fraudulent Vehicles they purchased or leased; lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendants' violations of the NY FAA.

907.    The New York Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial.  Because Defendants' conduct was committed willingly and knowingly, the New York Plaintiffs are entitled to recover, and hereby sue Defendants for three time's actual damages.  The New York Plaintiffs further sue Defendants for attorneys' fees and costs per N.Y. Gen. Bus. Law § 349(h) plus any other just and proper relief under the NY FAA.

## NORTH CAROLINA

908.    Plaintiffs Torre Albritton, Cynthia Albritton, Susan Carr Arney, Michael Cianciarulo, Doug Cody, Doris Green Cody, Michael DeArment, Ajay Gupta, Nicky Jackson, Jay Johnson, John Kaspar, Timothy King, Richard Koch, Douglas Leonard, Kal Patel, Latrell Person, and Avery Winder (collectively, the "North Carolina Plaintiffs") acquired their Fraudulent Vehicles while in the State of North Carolina.   As such, they bring the following causes of action against all defendants.

### NORTH CAROLINA COUNT 1- FRAUD
### (On behalf of the North Carolina Plaintiffs)

909.    The North Carolina Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

910.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the North Carolina Plaintiffs about the true nature of the Fraudulent Vehicles.   Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.   The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

911.    The Audi Gasoline Defendants valued their profits over the trust that the North Carolina Plaintiffs entrusted to them. The North Carolina Plaintiffs bought their cars from the Audi

194

Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

912.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the North Carolina Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

913.    Defendants' false representations and omissions were material to the North Carolina Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the North Carolina Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

914.    The North Carolina Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The North Carolina Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The North Carolina Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

915.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the North Carolina Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over

195

integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the North Carolina Plaintiffs.

916.    Defendants had a duty to disclose the Cheat Device to the North Carolina Plaintiffs.

917.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the North Carolina Plaintiffs, did not know about (and could not reasonably discover) its scheme.

918.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the North Carolina Plaintiffs.

919.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

920.     The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the North Carolina Plaintiffs.

921.     The North Carolina Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

922.     The North Carolina Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the North Carolina Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

923.     As a direct and proximate result of Defendants' fraudulent scheme, the North Carolina Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

924.     Defendants are liable to the North Carolina Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the North Carolina Plaintiffs sue Defendants.  Defendants' conduct was fraudulent,

done with malice, and willful and wanton. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the North Carolina Plaintiffs sue Defendants.

## NORTH CAROLINA COUNT 2-
## VIOLATIONS OF THE NORTH CAROLINA UNFAIR
## AND DECEPTIVE TRADE PRACTICES ACT
## (N.C. Gen. Stat. §§ 75-1.1, et seq.)
## (On behalf of the North Carolina Plaintiffs)

925.    The North Carolina Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

926.    The North Carolina Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

927.    The North Carolina Plaintiffs are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA").

928.    Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

929.    The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation" of the NCUDTPA. N.C. Gen. Stat. § 75-16. Defendants intentionally violated the NCUDTPA.

930.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in

198

the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The North Carolina Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

931.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the North Carolina NCUDTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

932.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

933.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

934.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the North Carolina Plaintiffs.

935.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

936.    The Audi Gasoline Defendants knew or should have known that their conduct violated the North Carolina NCUDTPA.

937.    Defendants owed the North Carolina Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the North Carolina Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the North Carolina Plaintiffs that contradicted these representations.

938.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

939.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the North Carolina Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

940.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the North Carolina Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

941.    The North Carolina Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The North Carolina Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The North Carolina Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

942.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the North Carolina NCUDTPA in the course of their business.

943.    Defendants' violations present a continuing risk to the North Carolina Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

944.    As a result of the foregoing wrongful conduct of Defendants, the North Carolina Plaintiffs have been damaged in an amount to be proven at trial, and hereby sue Defendants for all

just and proper remedies, including but not limited to actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damage plus court costs and reasonable attorneys' fees per N.C. Gen. Stat. § 75-16.1 plus any other just and proper relief available under N.C. Gen. Stat. § 75-16.

## OKLAHOMA

945.    Plaintiffs Cody Dickinson, Bertha Donovan, Todd Graves, Kevin Little, Anthony Love, and Donnie Nabors (collectively, the "Oklahoma Plaintiffs") acquired their Fraudulent Vehicles while in the State of Oklahoma.    As such, they bring the following causes of action against all defendants.

### OKLAHOMA COUNT 1- FRAUD
### (On behalf of the Oklahoma Plaintiffs)

946.    The Oklahoma Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

947.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Oklahoma Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the

Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

948.    The Audi Gasoline Defendants valued their profits over the trust that the Oklahoma Plaintiffs entrusted to them. The Oklahoma Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

949.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Oklahoma Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

950.    Defendants' false representations and omissions were material to the Oklahoma Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Oklahoma Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

951.    The Oklahoma Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Oklahoma Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Oklahoma Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

952.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Oklahoma Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Oklahoma Plaintiffs.

953.    Defendants had a duty to disclose the Cheat Device to the Oklahoma Plaintiffs.

954.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Oklahoma Plaintiffs, did not know about (and could not reasonably discover) its scheme.

955.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Oklahoma Plaintiffs.

956.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal

emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

957.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Oklahoma Plaintiffs.

958.    The Oklahoma Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

959.    The Oklahoma Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Oklahoma Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

960.    As a direct and proximate result of Defendants' fraudulent scheme, the Oklahoma Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

961.    Defendants are liable to the Oklahoma Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Oklahoma Plaintiffs sue Defendants.   Defendants engaged in conduct that was or amounted to fraud, oppression, gross negligence, malice (actual or presumed), evil intent, and/or reckless and wanton disregard of another's rights.   Defendants' conduct thus warrants the award of substantial exemplary damages in an amount to be determined at trial, for which the Oklahoma Plaintiffs sue Defendants.

**OKLAHOMA COUNT 2-**
**VIOLATIONS OF OKLAHOMA CONSUMER PROTECTION ACT**
**(Okla. Stat. Tit. 15 § 751, et seq.)**
**(On behalf of the Oklahoma Plaintiffs)**

962.    The Oklahoma Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

963.    The Oklahoma Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

964.    Defendants and the Oklahoma Plaintiffs are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

965.    Defendants engaged in "the course of [its] business" within the meaning of Okla. Stat. Tit. 15 § 752.3 with respect to the acts alleged herein. .

966.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing],

knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 19 15 § 753.

967.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Oklahoma Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

968.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Oklahoma CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

969.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high

quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

970.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

971.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Oklahoma Plaintiffs.

972.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

973.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Oklahoma CPA.

974.    Defendants owed the Oklahoma Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Oklahoma Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Oklahoma Plaintiffs that contradicted these representations.

975.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once

Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

976. Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Oklahoma Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

977. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Oklahoma Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

978. The Oklahoma Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Oklahoma Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Oklahoma Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

979.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business.

980.    Defendants' violations present a continuing risk to the Oklahoma Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

981.    Pursuant to Okla. Stat. Tit. 15 § 761.1, the Oklahoma Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorneys' fees and costs per Okla. Stat. Tit. 15 § 761.1 plus any other just and proper relief available under the Oklahoma CPA.

## PENNSYLVANIA

982.    Plaintiffs Michael Anness, Lindsay Anness, Francoise Barrionuevo, German Barrionuevo, Alan Baxter, Anthony Brooks, Toni Ingram, David Kaler, John Kearins, Andrew Lieberman, Francis Meduri, Mario Messina, John Nigro, Paul O'Brien, Alan Papinsick, Kimberley Rosenstein, Lucas Stachurski, Tien Tang, Jeffrey Tillery, and Scott Wetherby (collectively, the "Pennsylvania Plaintiffs") acquired their Fraudulent Vehicles while in the State of Pennsylvania. As such, they bring the following causes of action against all defendants.

### PENNSYLVANIA COUNT 1- FRAUD
### (On behalf of the Pennsylvania Plaintiffs)

983.    The Pennsylvania Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

984.    As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Pennsylvania Plaintiffs about the true nature of the

Fraudulent Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented. The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

985.    The Audi Gasoline Defendants valued their profits over the trust that the Pennsylvania Plaintiffs entrusted to them. The Pennsylvania Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

986.    Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Pennsylvania Plaintiffs. Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

987.    Defendants' false representations and omissions were material to the Pennsylvania Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles. As Defendants well knew, the Pennsylvania Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

988.    The Pennsylvania Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Pennsylvania Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Pennsylvania Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

989.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Pennsylvania Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Pennsylvania Plaintiffs.

990.    Defendants had a duty to disclose the Cheat Device to the Pennsylvania Plaintiffs.

991.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Pennsylvania Plaintiffs, did not know about (and could not reasonably discover) its scheme.

992.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker,"

vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Pennsylvania Plaintiffs.

993.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

994.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Pennsylvania Plaintiffs.

995.    The Pennsylvania Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

996.    The Pennsylvania Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Pennsylvania Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

997.    As a direct and proximate result of Defendants' fraudulent scheme, the Pennsylvania Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-

compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

998.    Defendants are liable to the Pennsylvania Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Pennsylvania Plaintiffs sue Defendants.   Defendants' conduct was outrageous, that is, it was malicious, wanton, willful, and oppressive, and shows reckless indifference to the interests of others.   Further, Defendants have acted with malice.   Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Pennsylvania Plaintiffs sue Defendants.

### PENNSYLVANIA COUNT 2-
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
### AND CONSUMER PROTECTION LAW
### (73 P.S. § 201-1, et seq.)
### (On behalf of the Pennsylvania Plaintiffs)

999.    The Pennsylvania Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1000.    The Pennsylvania Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

1001.    Defendants and the Pennsylvania Plaintiffs are "persons" within the meaning of 73 P.S. § 201-2.(2).

1002.    Defendants are engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

1003.    The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce ...." 73 P.S.§ 201-3.   The Pennsylvania UTPA prohibits (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (2) representing that goods or services are of a particular standard, quality or grade if they are of another; (3) advertising goods or services with intent not to sell them as advertised; (4) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.   73 P.S.§ 201-2(v), (vii), (ix), (xxi).   Defendants intentionally violated the aforementioned provisions of the Pennsylvania UTPA.

1004.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Pennsylvania Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

1005.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Pennsylvania UTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by

mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

1006.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1007.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

1008.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Pennsylvania Plaintiffs.

1009.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

1010.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Pennsylvania UTPA.

1011.    Defendants owed the Pennsylvania Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    b.     intentionally concealed the foregoing from the Pennsylvania Plaintiffs; and/or

    c.     made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Pennsylvania Plaintiffs that contradicted these representations.

1012.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

1013.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Pennsylvania Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

1014.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Pennsylvania Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

1015.    The Pennsylvania Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Pennsylvania Plaintiffs who acquired the Fraudulent Vehicles would

217

not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Pennsylvania Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1016.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of their business.

1017.    Defendants' violations present a continuing risk to the Pennsylvania Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1018.    Pursuant to 73 P.S. § 201-9.2(a), the Pennsylvania Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorneys' fees and costs per 73 P.S. § 201-9.2(a) plus any other just and proper relief available under the Pennsylvania UTPA.

## SOUTH CAROLINA

1019.    Plaintiffs Jeremy Brown, Alexandra Brown, James Dowd, Jason Kelly, Waller Mathias, Mahesh Patel and David Yim (collectively, the "South Carolina Plaintiffs") acquired their Fraudulent Vehicles while in the State of South Carolina.   As such, they bring the following causes of action against all defendants.

### SOUTH CAROLINA COUNT 1- FRAUD
### (On behalf of the South Carolina Plaintiffs)

1020.    The South Carolina Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

218

1021.   As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the South Carolina Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.  During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

1022.   The Audi Gasoline Defendants valued their profits over the trust that the South Carolina Plaintiffs entrusted to them. The South Carolina Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

1023.   Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the South Carolina Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

1024.   Defendants' false representations and omissions were material to the South Carolina Plaintiffs, as they concerned both the legality and core marketing features of the

Fraudulent Vehicles.  As Defendants well knew, the South Carolina Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

1025.    The South Carolina Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The South Carolina Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The South Carolina Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

1026.    Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the South Carolina Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the South Carolina Plaintiffs.

1027.    Defendants had a duty to disclose the Cheat Device to the South Carolina Plaintiffs.

1028.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the South Carolina Plaintiffs, did not know about (and could not reasonably discover) its scheme.

1029.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so

220

through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the South Carolina Plaintiffs.

1030.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

1031.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the South Carolina Plaintiffs.

1032.    The South Carolina Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

1033.    The South Carolina Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain

221

COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the South Carolina Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

1034.   As a direct and proximate result of Defendants' fraudulent scheme, the South Carolina Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

1035.   Defendants are liable to the South Carolina Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the South Carolina Plaintiffs sue Defendants.  Defendants' misconduct was willful, wanton, and in reckless disregard of the South Carolina Plaintiffs' rights.  Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the South Carolina Plaintiffs sue Defendants.

**SOUTH CAROLINA COUNT 2-**
**VIOLATIONS OF THE SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**(S.C. Code Ann. § 39-5-10, et seq.)**
**(On behalf of the South Carolina Plaintiffs)**

1036.   The South Carolina Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1037.   The South Carolina Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

1038.    Defendants and the South Carolina Plaintiffs are "persons" within the meaning of S.C. Code § 39-5-10(a).

1039.    Defendants are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

1040.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

1041.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The South Carolina Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

1042.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the South Carolina UTPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable

manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

1043.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1044.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information. The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

1045.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the South Carolina Plaintiffs.

1046.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

1047.    The Audi Gasoline Defendants knew or should have known that their conduct violated the South Carolina UTPA.

1048.    Defendants owed the South Carolina Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

224

b.    intentionally concealed the foregoing from the South Carolina Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the South Carolina Plaintiffs that contradicted these representations.

1049.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

1050.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the South Carolina Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

1051.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the South Carolina Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

1052.    The South Carolina Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The South Carolina Plaintiffs who acquired the Fraudulent Vehicles would

not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The South Carolina Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1053.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of their business.

1054.    Defendants' violations present a continuing risk to the South Carolina Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1055.    Pursuant to S.C. Code § 39-5-140(a), the South Carolina Plaintiffs sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages for willful and knowing violations plus punitive damages plus attorneys' fees and costs plus any other just and proper relief available under the South Carolina UTPA.

## TENNESSEE

1056. Plaintiffs Marc Bennett, Joy Bennett, Justin Graham, Paul Kukich, Judith Matthews, and Eddie Robba (collectively, the "Tennessee Plaintiffs") acquired their Fraudulent Vehicles while in the State of Tennessee.   As such, they bring the following causes of action against all defendants.

### TENNESSEE COUNT 1- FRAUD
### (On behalf of the Tennessee Plaintiffs)

1057.    The Tennessee Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1058.   As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Tennessee Plaintiffs about the true nature of the Fraudulent Vehicles.   Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.   The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

1059.   The Audi Gasoline Defendants valued their profits over the trust that the Tennessee Plaintiffs entrusted to them. The Tennessee Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

1060.   Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Tennessee Plaintiffs.   Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

1061.   Defendants' false representations and omissions were material to the Tennessee Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent

Vehicles. As Defendants well knew, the Tennessee Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

1062.  The Tennessee Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Tennessee Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Tennessee Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

1063.  Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Tennessee Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Tennessee Plaintiffs.

1064.  Defendants had a duty to disclose the Cheat Device to the Tennessee Plaintiffs.

1065.  The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Tennessee Plaintiffs, did not know about (and could not reasonably discover) its scheme.

1066.  The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other

228

sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Tennessee Plaintiffs.

1067.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

1068.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Tennessee Plaintiffs.

1069.    The Tennessee Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

1070.    The Tennessee Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain

229

COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Tennessee Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

1071.    As a direct and proximate result of Defendants' fraudulent scheme, the Tennessee Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

1072.    Defendants are liable to the Tennessee Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Tennessee Plaintiffs sue Defendants.    Defendants have acted intentionally, recklessly, maliciously, and fraudulently.    Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Tennessee Plaintiffs sue Defendants.

### TENNESSEE COUNT 2-
### VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977
### (Tenn. Code Ann. § 47-18-101, et seq.)
### (On behalf of the Tennessee Plaintiffs)

1073.    The Tennessee Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1074.    The Tennessee Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

1075.   The Tennessee Plaintiffs are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendants are "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

1076.   Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

1077.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.  The Tennessee CPA prohibits (1) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods; (2) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (3) representing that goods are of a particular standard, quality or grade if they are of another; (4) advertising goods with intent not to sell them as advertised; (5) engaging in any other act or practice which is deceptive to the consumer or to any other person. Tenn. Code § 47-18-104(b)(2), (5), (7), (9), (27).   Defendants intentionally violated the aforementioned provisions of the Tennessee CPA.

1078.   In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Tennessee Plaintiffs had no way of

discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

1079.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Tennessee CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

1080.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1081.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

1082.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Tennessee Plaintiffs.

1083.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

1084.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Tennessee CPA.

1085.    Defendants owed the Tennessee Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Tennessee Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Tennessee Plaintiffs that contradicted these representations.

1086.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

1087.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Tennessee Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

1088.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Tennessee Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality

of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

1089.    The Tennessee Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Tennessee Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Tennessee Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1090.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business.

1091.    Defendants' violations present a continuing risk to the Tennessee Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1092.    Pursuant to Tenn. Code § 47-18-109, the Tennessee Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), plus punitive damages plus attorneys' fees and costs per Tenn. Code § 47-18-109(e)(1), plus any other just and proper relief to the extent available under the Tennessee CPA.

## WASHINGTON

1093.   Plaintiffs Uri Berenshtein, Anna Berenshtein, Ben Currin, Kenneth Goldberg, Andrew Hasenyager, Richard Lawlor, Tina Mills, Kent Mills, James Needham, and Paul Nordholm (collectively, the "Washington Plaintiffs") acquired their Fraudulent Vehicles while in the State of Washington.   As such, they bring the following causes of action against all defendants.

### WASHINGTON COUNT 1- FRAUD
### (On behalf of the Washington Plaintiffs)

1094.   The Washington Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1095.   As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the Washington Plaintiffs about the true nature of the Fraudulent Vehicles.   Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.   During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.   The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

1096.   The Audi Gasoline Defendants valued their profits over the trust that the Washington Plaintiffs entrusted to them. The Washington Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

1097.   Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the Washington Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

1098.   Defendants' false representations and omissions were material to the Washington Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the Washington Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

1099.   The Washington Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The Washington Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The Washington Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

1100.   Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the Washington Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the Washington Plaintiffs.

1101.    Defendants had a duty to disclose the Cheat Device to the Washington Plaintiffs.

1102.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the Washington Plaintiffs, did not know about (and could not reasonably discover) its scheme.

1103.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the Washington Plaintiffs.

1104.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

1105.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws

governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the Washington Plaintiffs.

1106.    The Washington Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

1107.    The Washington Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the Washington Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

1108.    As a direct and proximate result of Defendants' fraudulent scheme, the Washington Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

1109.    Defendants are liable to the Washington Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the Washington Plaintiffs sue Defendants. Defendants have acted intentionally, recklessly, maliciously, and fraudulently. Defendants' conduct thus warrants the award of substantial punitive damages in an amount to be determined at trial, for which the Washington Plaintiffs sue Defendants.

238

**WASHINGTON COUNT 2-**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. §§ 19.86.010, et seq.)**
**(On behalf of the Washington Plaintiffs)**

1110.   The Washington Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1111.   The Washington Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

1112.   Defendants and the Washington Plaintiffs are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1113.   Defendants are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

1114.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.   Defendants intentionally violated the Washington CPA.

1115.   In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The Washington Plaintiffs had no way of

discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

1116.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the Washington CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

1117.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1118.    The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

1119.    The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the Washington Plaintiffs.

1120.    Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and $CO_2$ emissions were material to Plaintiffs.

240

1121.    The Audi Gasoline Defendants knew or should have known that their conduct violated the Washington CPA.

1122.    Defendants owed the Washington Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.    intentionally concealed the foregoing from the Washington Plaintiffs; and/or

c.    made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the Washington Plaintiffs that contradicted these representations.

1123.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted. In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

1124.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the Washington Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

1125.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the Washington Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality

of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

1126.    The Washington Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The Washington Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The Washington Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1127.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Washington CPA in the course of their business.

1128.    Defendants' violations present a continuing risk to the Washington Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1129.    Pursuant to Wash. Rev. Code § 19.86.090, the Washington Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus treble and punitive damages plus attorneys' fees and costs per Wash. Rev. Code § 19.86.090 plus any other just and proper relief available under the Washington CPA. Because Defendants' actions were willful and knowing, the Washington Plaintiffs' damages should be trebled.

**WEST VIRGINIA**

1130.   Plaintiffs Richard Buterbaugh, and Susan Hambric (collectively, the "West Virginia Plaintiffs") acquired their Fraudulent Vehicles while in the State of West Virginia.   As such, they bring the following causes of action against all defendants.

## WEST VIRGINIA COUNT 1- FRAUD
### (On behalf of the West Virginia Plaintiffs)

1131.   The West Virginia Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1132.   As alleged extensively above, the Audi Gasoline Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead the West Virginia Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the Cheat Devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants and achieved less fuel economy that was advertised and represented.  The result was precisely what the Audi Gasoline Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

1133.   The Audi Gasoline Defendants valued their profits over the trust that the West Virginia Plaintiffs entrusted to them. The West Virginia Plaintiffs bought their cars from the Audi Gasoline Defendants based on their representations regarding compliance with emissions standards, performance, and fuel economy.

1134.   Necessarily, the Audi Gasoline Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including the West Virginia Plaintiffs.  Defendants did so to falsely assure purchasers and lessors of their vehicles, including previously-owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air laws and emission regulations, and that their vehicles likewise comply with applicable laws and regulations.

1135.   Defendants' false representations and omissions were material to the West Virginia Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, the West Virginia Plaintiffs highly valued that the vehicles they were acquiring were high performance, fuel efficient, and had low emissions, and they paid a premium accordingly.

1136.   The West Virginia Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. The West Virginia Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Device was extremely sophisticated technology and could not be discerned by regulators, much less consumers. The West Virginia Plaintiffs did not, and could not, unravel Defendants' scheme on their own.

1137.   Defendants' devious scheme to design and install the Cheat Device in the Fraudulent Vehicles for the specific purpose of falsely representing to the West Virginia Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws, were high performance, and had excellent fuel economy, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasizes sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also the Audi Gasoline Defendants' customers, including the West Virginia Plaintiffs.

244

1138.    Defendants had a duty to disclose the Cheat Device to the West Virginia Plaintiffs.

1139.    The Audi Gasoline Defendants hatched the deceptive scheme and knew that their customers, including the West Virginia Plaintiffs, did not know about (and could not reasonably discover) its scheme.

1140.    The Audi Gasoline Defendants not only concealed the illegal Cheat Device, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles. The Audi Gasoline Defendants did so through their advertising, statements by corporate executives, and their website, among other sources. The Audi Gasoline Defendants' fraudulent statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by the Audi Gasoline Defendants such as the "window sticker," vehicle brochure, and other documents and advertisements provided to or otherwise made available to the West Virginia Plaintiffs.

1141.    Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles complied with legal emissions requirements, had a certain fuel economy, and were high performance, the Audi Gasoline Defendants had the duty to come clean about their Cheat Device – but they failed to do so.

1142.    The Audi Gasoline Defendants actively concealed the Cheat Device and actual emission levels, fuel economy, and performance of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws

governing clean air and emissions. The Audi Gasoline Defendants engaged in this fraudulent concealment at the expense of the West Virginia Plaintiffs.

1143.    The West Virginia Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in acquiring their Fraudulent Vehicles.

1144.    The West Virginia Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—the Audi Gasoline Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence the West Virginia Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

1145.    As a direct and proximate result of Defendants' fraudulent scheme, the West Virginia Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

1146.  Defendants are liable to the West Virginia Plaintiffs for damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be proven at trial, for which the West Virginia Plaintiffs sue Defendants.    Defendants' conduct constitutes gross fraud, malice, oppression, and wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others.  Defendants' conduct thus warrants the award of

substantial punitive damages in an amount to be determined at trial, for which the West Virginia Plaintiffs sue Defendants.

## WEST VIRGINIA COUNT 2-
### VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
### (W. Va. Code § 46A-1-101, et seq.)
### (On behalf of the West Virginia Plaintiffs)

1147.   The West Virginia Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1148.   The West Virginia Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any, including those of the West Virginia Consumer Credit and Protection Act.

1149.   Defendants and the West Virginia Plaintiffs are "persons" within the meaning of W. Va. Code § 46A-1-102(31).  The West Virginia Plaintiffs are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

1150.   Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

1151.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  W. Va. Code § 46A-6-104.  The West Virginia CCPA prohibits (1) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods; (2) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (3) representing that goods or services are of a particular standard, quality or grade, if they are of another; (4) advertising goods with intent not to sell them as advertised; and (5) engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.  W. Va. Code § 46A-6-

247

102(7)(B), (E), (G), (I), (L). Defendants intentionally violated the aforementioned provisions of the West Virginia CCPA.

1152.    In the course of their business, the Audi Gasoline Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by Fraudulent Vehicles. Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission, low fuel economy test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants and have reduced fuel economy. The result was what the Audi Gasoline Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. The West Virginia Plaintiffs had no way of discerning that the Audi Gasoline Defendants' representations were false and misleading because the Audi Gasoline Defendants' defeat device software was extremely sophisticated technology.

1153.    Defendants engaged in misleading, false, unfair and deceptive acts or practices that violated the West Virginia CCPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, by mispresenting fuel economy and performance, and by presenting themselves as reputable manufacturers that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

1154.    The Audi Gasoline Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

1155.   The Audi Gasoline Defendants knew they had installed the Cheat Device in the Fraudulent Vehicles, but concealed all of that information.  The Audi Gasoline Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

1156.   The Audi Gasoline Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead the West Virginia Plaintiffs.

1157.   Defendants' fraudulent use of the Cheat Device and their concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption, performance, and CO2 emissions were material to Plaintiffs.

1158.   The Audi Gasoline Defendants knew or should have known that their conduct violated the West Virginia CCPA.

1159.   Defendants owed the West Virginia Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

b.   intentionally concealed the foregoing from the West Virginia Plaintiffs; and/or

c.   made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from the West Virginia Plaintiffs that contradicted these representations.

1160.   Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted.

In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

1161.    Defendants' supply and use of the Cheat Device and concealment of the true characteristics of the engine system were material to the West Virginia Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

1162.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including the West Virginia Plaintiffs, about the true environmental cleanliness, performance and fuel efficiency of Audi-branded vehicles, the quality of the Audi brand, the devaluing of environmental cleanliness and integrity at Audi, and the true value of the Fraudulent Vehicles.

1163.    The West Virginia Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information. The West Virginia Plaintiffs who acquired the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. The West Virginia Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1164.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of their business.

1165.    Defendants' violations present a continuing risk to the West Virginia Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1166.    Pursuant to W. Va. Code § 46A-6-106(a), the West Virginia Plaintiffs hereby sue Defendants for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) plus punitive damages plus attorney's fees and costs per W. Va. Code § 46A-6-106 plus any other just and proper relief available under the West Virginia CCPA.

## AD DAMNUM CLAUSE

1167.    Each plaintiff hereby seeks $725,000 in damages for each affected vehicle.

1168.    Plaintiffs collectively seek damages in excess of $5 million.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants, as follows:

A.    Actual damages;

B.    Treble damages;

C.    Punitive and exemplary damages;

D.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.    An award of litigation expenses, costs and attorneys' fees; and

F.    Such other or further relief as may be appropriate.

251

DATED:  November 2, 2018.

Respectfully submitted,

Charles Wade Miller
VSB No. 92647
Attorney for Plaintiffs
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Tel: (214) 237-9001
Fax: (214) 237-9002
charles@hop-law.com

**Attorney for Plaintiffs**

*Pro Hac Vice Admission to be sought for*
Eric D. Pearson
eric@hop-law.com
HEYGOOD, ORR & PEARSON
6363 North State Highway 161, Suite 450
Irving, Texas 75038
Tel: (214) 237-9001
Fax: (214) 237-9002

**Attorneys for Plaintiffs**

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

HASSAN ALJUAID, et al.,                      )
                                             )
Plaintiffs,                                  )
                                             )
v.                                           )        Case No.:      CL-2018-15768
                                             )
VOLKSWAGEN GROUP OF                          )
AMERICA, INC., et al.,                       )
                                             )
Defendants.                                  )

## VOLKSWAGEN GROUP OF AMERICA, INC. AND
## AUDI OF AMERICA, LLC'S DEMURRER

COMES NOW Defendants Volkswagen Group of America, Inc. ("VW America") and Audi of America, LLC ("Audi America") (collectively "Defendants"), by and through its undersigned counsel, and for their Demurrer to Plaintiffs' Complaint state as follows.

## GROUNDS FOR DEMURRER

1.      Plaintiffs are citizens of 23 states and Washington, D.C. who allegedly "acquired" various models of Audi brand vehicles. (Compl. ¶¶ 1-177.) Plaintiffs fail to allege when or from whom they "acquired" the vehicles in question. (*Id.*) In fact, Plaintiffs fail to allege whether they purchased the vehicles, leased the vehicles, or even "acquired" them as gifts. (*Id.*) Plaintiffs assert claims against Defendants for Fraud and violation of the consumer protection statutes of Arizona, Arkansas, Colorado, Connecticut, Washington, D.C., Delaware, Florida, Kansas, Kentucky, Louisiana, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Washington, and West Virginia.

1

2.    Defendants demur to Plaintiffs' fraud[1] and state statutory consumer protection act claims[2] because they fail to comply with the Rules of the Supreme Court of Virginia, which provide that "[e]very pleading shall state the facts on which the party relies in numbered paragraphs, and it shall be sufficient if it clearly informs the opposite party of the true nature of the claim." Va. R. Sup. Ct. 1:4(d). Moreover, Plaintiffs' claims, which are grounded in allegations of fraud, do not satisfy the more rigorous pleading requirement for such causes of action. *See, e.g., Ciarochi v. Ciarochi,* 194 Va. 313, 315 (1952) ("Where fraud is relied on, the [pleading] must show specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defence [sic] accordingly, and since [fraud] must be clearly proved it must be distinctly stated.").

3.    Here, Plaintiffs' claims involve allegations of fraud and misrepresentation, but lack the specificity required to state such claims. Fraud is an individualized, fact-specific claim that requires specific allegations regarding "the identities of the people who perpetrated the fraud and details of the time and place where the fraudulent acts occurred." *Thonen v. Lacy,* 20 Va. Cir. 490, 491 (Fairfax Co. 1990). However, the Complaint alleges only blanket allegations regarding unspecified representations concerning the "characteristics" of the vehicle and fails to specifically identify who made those representations or when and where Plaintiffs were exposed to them. In

---

[1] Plaintiffs identify these claims as Arizona Count 1, Arkansas Count 1, Colorado Count 1, Connecticut Count 1, Washington, D.C. Count 1, Delaware Count 1, Florida Count 1, Kansas Count 1, Kentucky Count 1, Louisiana Count 1, Minnesota Count 1, Mississippi Count 1, Nevada Count 1, New Hampshire Count 1, New Jersey Count 1, New Mexico Count 1, New York Count 1, North Carolina Count 1, Oklahoma Count 1, Pennsylvania Count 1, South Carolina Count 1, Tennessee Count 1, Washington Count 1, and West Virginia Count 1.

[2] Plaintiffs identify these claims as Arizona Count 2, Arkansas Count 2, Colorado Count 2, Connecticut Count 2, Washington, D.C. Count 2, Delaware Count 2, Florida Count 2, Kansas Count 2, Kentucky Count 2, Louisiana Count 2, Minnesota Count 2, Nevada Count 2, New Hampshire Count 2, New Jersey Count 2, New Mexico Count 2, New York Counts 2-3, North Carolina Count 2, Oklahoma Count 2, Pennsylvania Count 2, South Carolina Count 2, Tennessee Count 2, Washington Count 2, and West Virginia Count 2.

fact, Plaintiffs fail to plead facts sufficient to show that any representation regarding the vehicles at issue actually was false or misleading. As this Court has previously held, vague references to statements allegedly made by defendants that do "not identify when the statements were made or observed" will not suffice. *In re: Volkswagen "Clean Diesel" Litig.*, 94 Va. Cir. 189, at *9 (Fairfax Co. 2016). "[W]here fraud is relied on, the [pleading] must show specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defense accordingly, and since [fraud] must be clearly proved it must be distinctly stated." *Mortarino v. Consultant Eng'g Servs., Inc.*, 251 Va. 289, 295 (1996) (citations omitted). These claims fail under this Court's prior precedent.

4.    Plaintiffs likewise fail to plead facts demonstrating that Audi America knowingly made any misrepresentation or concealed any material fact from Plaintiffs. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994).

5.    Defendants demur to each of the Counts in the Complaint for the additional reason that the allegedly fraudulent statements at issue constituted inactionable puffery or are preempted by federal law. *See Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 712-13 (2001); *see also* ¶ 7, *infra*. To the extent Plaintiffs allege that the alleged fraud consisted of a failure to disclose, Plaintiffs failed to plead facts demonstrating that Defendants owed Plaintiffs a duty of disclosure.

6.    Defendants further demur to Plaintiffs' claims because they lack standing to assert them. Specifically, Plaintiffs have failed to plead facts showing that they have suffered "injury in fact – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Wilkins v. West*, 264 Va. 447, 459 (2002) (quoting *United States v. Hays*, 515 U.S. 737, 743 (1995) (internal quotation marks omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("The plaintiff must have (1) suffered an injury

3

in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."). Additionally, Plaintiffs have failed to plead facts showing that they have suffered a cognizable injury because they have not even alleged facts showing that they purchased or otherwise spent money to acquire the vehicles as issue. (Compl. ¶¶ 1-177 (alleging merely that Plaintiffs "acquired" the vehicles in question.) Instead, Plaintiffs merely plead that they will suffer speculative future injuries. These allegations fail to establish that Plaintiffs have standing to bring their purported claims.

7.    Finally, the federal Clean Air Act ("CAA"), the federal Energy Policy and Conservation Act ("EPCA"), and Federal Trade Commission ("FTC") regulations expressly and impliedly preempt Plaintiffs' claims for fraud and violation of state consumer protection statutes. In particular, Plaintiffs' claims "relat[e] to the control of emissions from new motor vehicles" and are preempted under Section 209(a) of the CAA, which expressly provides that states may not "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a); *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 3816738, at *8, 14 (N.D. Cal. Aug. 31, 2017) (Dkt. No. 3747) (dismissing state law tampering and concealment claims as barred by Section 209(a) because plaintiff sought "to enforce a standard relating to the control of emissions from new motor vehicles"). Additionally, the EPCA and FTC regulations preempt Plaintiffs' claims related to fuel economy representations because those regimes "comprehensive[ly]" dictate the requirements for fuel economy disclosures in Monroney labels and advertisements. *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369, at *4 (S.D.N.Y. Nov. 12, 2015).

## BRIEF IN SUPPORT OF DEMURRER

Pursuant to Rule 4:15 of the Rules of the Supreme Court of Virginia, Defendants request a briefing schedule for this Demurrer because they anticipates that the brief in support of this Demurrer will exceed five pages.

## CONCLUSION

WHEREFORE, VW America and Audi America respectfully requests that the Court sustain this Demurrer and dismiss Plaintiffs' Complaint with prejudice.

Dated: December 7, 2018

Respectfully submitted,

VOLKSWAGEN GROUP OF AMERICA, INC. and AUDI OF AMERICA, LLC

*Kathryn M. Caimi*

John D. Wilburn, Esquire (VSB No. 41141)
Kathryn M. Caimi, Esquire (VSB No. 78853)
McGuireWoods LLP
1750 Tysons Boulevard, Suite 1800
McLean, VA 22102
Tel.: (703) 712-5000
Fax: (703) 712-5228
jwilburn@mcguirewoods.com
kcaimi@mcguirewoods.com

Terrence M. Bagley, Esquire (VSB No. 22081)
Christopher E. Trible, Esquire (VSB No. 48847)
Kenneth W. Abrams, Esquire (VSB No. 78216)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1000
Fax: (804) 698-2008
tbagley@mcguirewoods.com
ctrible@mcguirewoods.com
kabrams@mcguirewoods.com

Michael H. Steinberg, Esquire (*pro hac vice* forthcoming)
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA  90067
Tel.:  (310) 712-6600
Fax:  (310) 712-8800
steinbergm@sullcrom.com

Julia M. Jordan, Esquire (*pro hac vice* forthcoming)
Sullivan & Cromwell LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Tel.:  (202) 956-7500
Fax:  (202) 293-6330
jordanjm@sullcrom.com

William B. Monahan, Esquire (*pro hac vice* forthcoming)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004
Tel.:  (212) 558-4000
Fax:  (212) 558-3588
monahanw@sullcrom.com

*Counsel for Defendants Audi of America, LLC and Volkswagen Group of America, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2018, a true and correct copy of the foregoing instrument was emailed and sent via Federal Express to:

> Charles Miller, Esquire
> Eric Pearson, Esquire
> John Chapman, Esquire
> HEYGOOD, ORR & PEARSON
> 6363 North State Highway 161, Suite 450
> Irving, Texas 75038
> Telephone: (214) 237-9001
> Facsimile: (214) 237-9002
> charles@hop-law.com
> eric@hop-law.com
> jchapman@hop-law.com

_Kathryn M. Caimi_
Kathryn M. Caimi

110516697_1.docx

7